[No. D015560. Fourth Dist., Div. One. Sept. 22, 1993.]

CAROL KOEPKE, Plaintiff and Appellant, v.
LISA LOO, Defendant and Respondent.

**COUNSEL**

Marian H. Tully for Plaintiff and Appellant.

Virginia R. Gilson, McInnis, Fitzgerald, Rees, Sharkey & McIntyre, William M. Low, Earl H. Maas III and Michael A. Leone for Defendant and Respondent.

**OPINION**

**FROEHLICH, J.**—This is an appeal from a summary judgment in favor of the defendant in a personal injury lawsuit. The facts of the case are not in dispute, and we state them as reflected in the moving papers in the summary judgment motion, and as set forth in the appellate briefs of both appellant and respondent. The issue is whether the negligent failure of defendant, Lisa Loo (Loo), to warn plaintiff, Carol Koepke (Koepke), of a probable assault from a third party can result in liabililty. The case raises classic issues of duty and proximate cause. We conclude that under the circumstances of this case the defendant had no duty to take any action for the benefit of plaintiff, and therefore even though her lack of action may be deemed careless, it is not actionable negligence.

## FACTS

Loo was the owner of a typesetting business. Norman Logan (Logan) was employed as a typesetter in the business. Commencing sometime in 1979 and continuing for approximately two years Loo and Logan lived together and were involved in a personal and sexual relationship. During this period Loo became aware of the fact that Logan had a drinking problem. Logan continued to work for Loo after the termination of their personal relationship.

Koepke became romantically involved with Logan in 1987. They did not live together, but maintained an affinity in that their boats were docked together in the same anchorage. Their relationship, though serious, was somewhat on and off, finally terminating in February 1989 after a vacation they shared in Lake Tahoe.

Shortly following this breakup Logan called Loo and told her that he was going to kill Koepke. Loo knew that Logan possessed a small handgun, which she had seen in his car sometime between 1981 and 1984. Loo called Peter Logan, the brother of Logan, and told him that Logan was going to attack Koepke. Peter Logan called Koepke and relayed this message.

Koepke attempted to leave her apartment to avoid any confrontation with Logan, but was unsuccessful. Logan confronted her as she was exiting and held a gun to her head. Koepke's screams and attempts to escape roused the neighbors. Logan, then fearing the police had been called, departed. This all occurred on February 23, 1989.

Loo learned of the assault and on the day thereafter, February 24, discussed the matter at length with Logan. Logan did not remember the incident, claiming he had "blacked out" in a drunken state. Loo convinced Logan to join Alcoholics Anonymous and to commence psychiatric treatment. Logan volunteered to give up his gun, and Loo accepted it with its ammunition, putting the items in her locked desk drawer. Loo was the only person with access to the drawer.

After the February assault Koepke obtained a temporary restraining order requiring Logan to stay 500 feet away from her. On the day before she was scheduled to appear for a hearing on the preliminary injunction, Loo called her and suggested that she not go through with the hearing, because Logan wanted nothing more to do with her. She further stated: "You don't have to worry. I have the gun." Koepke was relieved to hear this, and believed she was no longer in danger from Logan. She nevertheless went forward with the injunction hearing.

On March 26, 1989, at Logan's request, Loo returned the gun and ammunition to Logan. At that time Logan appeared to Loo to be stable, and was not making any threats against Koepke. Loo did not tell Koepke that she had returned the gun and ammunition.

On March 28, 1989, Koepke was at work as manager of a Howard Johnson Hotel. Logan confronted her and fired four or five shots, some of them striking Koepke in the legs. Logan left; Koepke crawled under her desk and called the police; the police pursued Logan in a chase down the freeway; Logan shot and killed himself.

Koepke testified that the weapon Logan used to kill himself was the same weapon he had used to threaten her in February and to assault her in March. This was a .38-caliber handgun. Officers investigating the shooting at the hotel found a 9-mm shell casing.

Koepke suffered severe and permanent injury from the assault. She underwent surgery and will require additional surgery. She was unable to walk for several months, and only gradually achieved mobility with a wheelchair, crutches, a walker and a brace.

## LOWER COURT RULING

Koepke's action against Loo consisted of a single cause of action for negligence. Loo filed a motion for summary judgment, contending: (1) Loo's action was not the proximate cause of Koepke's injuries because Koepke was shot with a 9-mm gun rather than the .38-caliber gun Loo returned to Logan; (2) Loo's negligence, if any, was not the proximate cause of the injury because Logan's criminal act was an intervening and superseding cause; and (3) Loo cannot be liable to Koepke for negligence because she had no legal duty of care toward Koepke.

The trial court ruled that Loo's actions were not the cause of Koepke's injuries because Koepke was shot with a 9-mm weapon while Loo's negligence, if any, related to a .38-caliber weapon. The court further ruled that Logan's action was in any event an intervening superseding cause, thus insulating Loo's prior negligence from liability. Finally, the court in its ruling from the bench discussed foreseeability in terms suggesting it was resting its ruling on a lack of duty by Loo to Koepke. The minute order following the hearing indicated that the defendant's motion for summary judgment was granted because there were "[n]o material facts present to create a triable issue of fact on duty and special relationship."

## DISCUSSION

The elements of a cause of action for negligence are: (1) the existence of a duty on the part of the actor toward another to take action to

protect against risk; (2) the failure on the part of the actor to conform to a required standard of conduct in light of the duty imposed; (3) a reasonably close connection between the conduct and the resulting injury, commonly called "proximate cause"; and (4) actual loss or damage resulting from such injury. (Prosser & Keeton on Torts (5th ed. 1984) § 30, pp. 164-165.)

The act or failure to act at issue in this case was Loo's failure to warn Koepke that Logan again had possession of his gun and ammunition, after Loo had previously assured Koepke that she, Loo, had taken possession of the gun and ammunition.[1] Koepke asserts it was Loo's duty to alert her to the likely criminal and dangerous conduct of Logan, so that she, Koepke, could take precautionary measures. Before reaching the question of the existence of a duty, we will briefly discuss the related contentions of the defendant which pertain to other elements of a cause of action for negligence.

The first of these contentions is based upon the theory that Logan's criminal conduct was a superseding intervening cause (a theory accepted by the court as an alternative ground for its ruling). ■ Criminal conduct which causes injury will ordinarily be deemed *the* proximate cause of an injury, superseding any prior negligence which might otherwise be deemed a contributing cause. (See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 992, pp. 382, 383.) However, "[i]f the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby." (Rest.2d Torts, § 449, quoted in *Vesely* v. *Sager* (1971) 5 Cal.3d 153, 164 [95 Cal.Rptr. 623, 486 P.2d 151]; see also *Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 69 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059].)

Here the very hazard against which Loo's warning might have guarded was the criminal conduct of Logan previously exhibited and likely to occur again. Therefore, the occurrence of such criminality could not be a superseding cause of Koepke's injuries. Accordingly, the trial court erred in citing this as a ground for the granting of summary judgment in favor of Loo. ■ In any event this issue, being a question of proximate cause, was a jury question which could not be decided as a matter of law by the trial

---

[1]Koepke's amended complaint identified three potential negligent acts or omissions: (1) failing to dispose of the gun once Loo had obtained its possession; (2) returning the gun to Logan upon his request; and (3) failing to notify Koepke that the gun had been returned. The arguments made at summary judgment, the focus of the trial court, and the subject of the appellate briefs, however, are all directed solely to the asserted negligence of Loo in failing to warn Koepke after the gun was returned to Logan.

court unless from the facts only one reasonable conclusion could be drawn. (*Kane* v. *Hartford Accident & Indemnity Co.* (1979) 98 Cal.App.3d 350, 359 [159 Cal.Rptr. 446]; 6 Witkin, Summary of Cal. Law, *supra*, § 749, pp. 86, 87.) When the issue is one of fact it cannot be decided on summary judgment unless no disputable issue of fact exists. (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) It cannot be said here that the foreseeability of harm to Koepke by reason of Loo's failure to warn of Logan's repossession of his gun was an issue without dispute. Therefore it could not be resolved by summary adjudication.

The court also erred (again assuming the issue of duty to have been determined in favor of Koepke) in concluding as a matter of law that Loo's negligence was not the cause of Koepke's injuries because of the conflicting evidence concerning the caliber of the weapon used by Logan. Here the defendant's argument is that the failure to warn of possession of a .38-caliber weapon was no cause of the injury because a 9-mm weapon, rather than a .38-caliber gun, was used. This argument misses the point that a warning to Koepke might have resulted in protective measures which would have guarded against any assault by Logan, no matter what the caliber of gun he possessed. A shorter response, however, is that the evidence was in conflict and doubt as to what sort of weapon was used by Logan in the shooting. Koepke testified that the weapon used was the same that she had seen at the time of the previous assault, which was also the weapon used in Logan's suicide—a .38-caliber handgun. That a 9-mm shell casing was found at the site of the shooting raises doubts and questions but no definitive answers. It does not, as suggested by the trial court, disprove that a .38-caliber gun was used. Among other obvious possibilities is that Logan possessed and used two guns at the time of the shooting. As with the other disputed question of fact discussed above, this was one not susceptible to resolution on summary judgment. (See *Molko* v. *Holy Spirit Assn.*, *supra*, 46 Cal.3d 1092.)

■ The ground upon which the trial court's order is sustainable is the first prong of the definition of negligence: the determination of duty. If Loo had no duty to contact and warn Koepke, after returning to Logan his gun and ammunition, then she cannot be found liable even though it be determined that the failure to give the warning was a contributing actual cause of the injury. Unlike other questions to be determined in a negligence case (i.e., the exercise of due care, actual and proximate cause), the existence of duty is a question of law for court determination. (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].) It was therefore incumbent upon the trial court to determine, in the setting of these undisputed facts, whether Loo had a duty to warn Koepke. Our review of the trial

court's determination, as the review of a question of law, is a "de novo" or independent review. (Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs 1 (The Rutter Group 1992) ¶¶ 8.1-8.3; 6 Witkin, *supra*, § 748, pp. 83-86.)

The determination of the existence of a duty involves more than simply the establishment of the likelihood of harm to a third person if the actor fails to measure up to a standard of reasonable conduct. As we said in *Marois* v. *Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193, 198 [208 Cal.Rptr. 384], considerations of policy "on occasion lead courts to refuse to impose liability even when the plaintiff's injury was caused by the defendant's failure to act reasonably." (Italics omitted.) ■ An excellent explanation of "duty" in the negligence context is contained in the famous footnote 6 in *Ballard* v. *Uribe*, *supra*, which deserves quotation at length: " '[D]uty' is not an immutable fact of nature ' "but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] [quoting Prosser, Law of Torts (3d ed. 1964) pp. 332, 333].) In California, the general rule is that all persons have a duty ' "to use ordinary care to prevent others being injured as the result of their conduct. . . ." ' (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; Civ. Code, § 1714.) *Rowland* enumerates a number of considerations, however, that have been taken into account by courts in various contexts to determine whether a departure from the general rule is appropriate: 'the major [considerations] are *the foreseeability of harm to the plaintiff*, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Ballard* v. *Uribe*, *supra*, 41 Cal.3d. at pp. 572, 573, fn. 6, italics added by *Ballard*.)

While, as noted, one must always use "ordinary care" so as to avoid "injury . . . to another" (Civ. Code, § 1714), the common law establishes a different rule in terms of the control of others. ■ As a general rule, ". . . one person [owes] no duty to control the conduct of another [citations], nor to warn those endangered by such conduct . . . ." (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166], fn. omitted.) The creation of a duty, therefore, must rest upon some special circumstance warranting the imposition of a duty. Prosser and Keeton, *supra*, at section 56, page 373 et seq.

enumerate a number of special circumstances or "special relations" which give rise to a duty—such as the obligations of common carriers toward their passengers, those of innkeepers to their guests, shopkeepers to their business invitees. Where an actor's negligence puts a third party in danger a duty may arise to assist, or to warn. While there may be no duty to assist an unrelated person in peril, once such assistance has been undertaken it must be carried out with reasonable care. Thus, the priest and the Levite may walk by the injured traveler with impunity, but the good Samaritan who stops to aid must do so carefully. (See *Williams* v. *State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137]; *Denton* v. *City of Fullerton* (1991) 233 Cal.App.3d 1636, 1640 [285 Cal.Rptr. 297].)

 In measuring Loo's potential duties we could look for a "special relationship" in terms of either the Loo-Logan or the Loo-Koepke relationship.[2] We reject with little discussion the concept that the Loo-Logan relationship gave rise to a duty to warn Koepke. Since Logan's actions were in no way related to his employment by Loo, the employer-employee relationship which existed between them cannot give rise to a duty. The fact that Loo was a past lover of Logan surely can be no basis for a continuing duty. While casual sexual relationships may not be regarded as keystones of current societal value, they nevertheless have their obvious advantages. One of them is the potential of termination of the relationship without regard to consequences. We would not want to write an opinion imposing on ex-cohabitants a continuing obligation of control of the conduct of discarded lovers. Loo's undertaking to assist Logan in his rehabilitation, by paying for his psychiatrist and urging his attendance at Alcoholics Anonymous, may evidence some sort of continuing concern for Logan but, as we discuss below, would not have imposed an obligation upon Loo in terms of duty to Koepke or Logan.

We turn, then, to an examination of the special relationship between Loo and Koepke. They had, in fact, no relationship (other than the status of serial paramour and ultimate rejector of the alcoholic and aberrant Logan). That Loo attempted to counsel Logan and persuade him to attend Alcoholics Anonymous and undergo a course of psychiatric treatment cannot be the basis of an obligation to Koepke. It can be argued that Loo, having taken possession of Logan's gun, had a duty not to return the gun to Logan. This

---

[2]The "special relationship" giving rise to a duty can be either the relationship between the actor (here Loo) and the dangerous person (here Logan) or the relationship between the actor and the victim damaged by the dangerous person. (See *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at pp. 435, 436.)

contention was made in the pleadings but not seriously pursued in the summary judgment proceedings, and is not argued on appeal.[3]

The aspect of Loo's activities which can best be argued as creative of a special relationship was her indirect warning to Koepke in February, advising that Logan was coming to assault her, followed by the later advice that Logan had given up his gun and was no longer a danger. Koepke contends that having undertaken this course of counseling it was incumbent upon Loo to advise Koepke when the status of Logan's gun possession changed—to advise that he again might be dangerous.

An attempt to apply the several public policy considerations set forth in *Rowland* v. *Christian* (quoted above in *Ballard* v. *Uribe*) does not provide a ready answer to the question of the existence of a duty in this case. While there may be practical foreseeability of harm if one fails to alert another of a threat to attack, there usually exists no substantial degree of certainty that the attack will be carried out or that the threatened party will suffer injury (i.e., the predictability of Logan's behavior in this case is at best questionable). Insurance coverage for this sort of risk is certainly unusual; this is not the sort of risk ordinarily contemplated by either the insured or the insurer. Since Loo had no typically definable relationship to Koepke, it is difficult to label her failure to warn as morally blameworthy; and the consequences to the community of imposing this sort of duty on people seem of doubtful benefit. On the other hand, the policy of preventing future harm favors imposition of a duty, and the burden on the defendant Loo to have made a brief telephone call to Koepke seems very minor.

We look to precedent for assistance in making this policy decision, and find none directly in point. There are, however, several lines of cases which shed light on an appropriate approach to the problem. Most easily understood are those cases which impose a duty to warn persons in peril when the actor has done something to cause the imperiled person to rely on the future care of the actor, and in which the actor is in a position of peculiar authority or knowledge such as to make the performance of this duty to warn reasonable.

Illustrative of this situation is *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352]. The plaintiff in this case was a foster parent who took in a juvenile upon reference from the Youth Authority. After the plaintiff was attacked and injured by the juvenile, the state was

---

[3]Presumably this contention was not pursued because of the evident point that, there being no dispute as to ownership of the weapon, Loo had no choice but to return it to Logan upon his request. Although it is conceivable that Loo might have had some duty to refuse return of the weapon had Logan advised of its intended use, the evidence is to the contrary: Loo testified that when the gun was returned to Logan he appeared rational and made no threats.

found negligent in placing the child in her care without warning of the child's "homicidal tendencies, and a background of violence and cruelty towards both animals and humans." (*Id.* at p. 784.) There is a duty, the Supreme Court stated, "upon those who create a foreseeable peril, not readily discoverable by endangered persons, to warn them of such potential peril." (*Id.* at p. 786.)

A similar ruling imposing a duty upon governmental authority which undertakes a relationship putting a citizen in danger is found in *Carpenter* v. *City of Los Angeles* (1991) 230 Cal.App.3d 923 [281 Cal.Rptr. 500]. The plaintiff in this case was a prosecution witness who had been personally threatened by the criminal defendant. He was advised by the prosecutor's investigator that the criminal was a small-time crook who posed no threat. The investigator later learned that the criminal defendant was attempting to arrange a "hit" on the plaintiff, but took no steps to warn the plaintiff. This failure to warn was held negligence when the plaintiff was subsequently injured by an unknown assailant, who presumably was the "hit" man retained by the criminal defendant. The court held that ". . . appellant, as a witness in a criminal prosecution who had been assured that the defendant posed no real danger to him, enjoyed a special relationship with the City, through its police department, such that the City owed appellant a duty of care, which required it to warn appellant about [the criminal accused's] subsequent threat to appellant's life." (*Id.* at p. 931.)

A similar conclusion was reached in *Wallace* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1385 [16 Cal.Rptr.2d 113], where the police failed to warn a person they had enlisted as a witness to a crime that she was in danger because of known threats from the criminal.

To be distinguished from this line of cases is a parallel series of cases involving failure by police to protect citizens, in which the police were found not to have a duty because no action was taken which would have caused the citizen to place any special reliance upon police protection. In *Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197 [185 Cal.Rptr. 252, 649 P.2d 894], the fact that police officers were watching a laundromat for the purpose of apprehending the perpetrator of assaults did not impose a duty to warn the plaintiff user of the laundromat. In *Denton* v. *City of Fullerton* (1991) 233 Cal.App.3d 1636 [285 Cal.Rptr. 297], a police crime investigation revealed that an assailant in an apartment complex laundry room had entered a certain apartment, but the police found the apartment locked and obtained no response to the doorbell. The police were held not to have a duty to locate and warn the occupant of the apartment, who was assaulted by the criminal in her apartment upon her return home. The key factor in *Denton*, as

in other similar cases, appears to be that the police had done nothing to cause special reliance by the plaintiff upon any police warning.

Yet another similar case is *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]. There the county was found to have no duty to warn unidentified neighbors of the release of a dangerous juvenile to the custody of his mother. The court was concerned about the detriment to parole and probation programs which might result from the imposition of such a generalized duty, and noted that the danger was evidenced only by "*nonspecific threats of harm directed at nonspecific victims.*" (*Id.* at p. 754, italics in original.)

These cases involving the potential obligation of governmental entities to warn citizens seem not to control the resolution of the duty issue in this case. On the one hand, there is reluctance to impose broad and undefined duties upon police or other governmental authorities, the concern being that to do so would unduly burden those who perform in areas of acknowledged difficulty of decisionmaking and inability to gain complete control of circumstances. On the other hand, such authority by its nature is more competent to determine when a warning is necessary than is the ordinary citizen, and when the victim has cause to rely upon the authority's protection such reliance is found protectible. Neither factor is present in our case. Loo lacked training and skill in identifying danger or giving warnings. Further, although, as we discuss below, Koepke may have had an arguable basis of reliance, Loo was in no position to assure Koepke of any concrete protection from Logan's potential attacks.

The key in the police cases seems to be the identification of a particular victim who has cause to rely specially upon the police. There are cases, however, which impose a duty without this factor. The most important of these is *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d 425. The acting defendant in this case was a psychologist employed by the hospital of the University of California. The psychologist's patient revealed an intent to murder the victim. When the patient was released from custody the psychologist, knowing of this threat and believing the patient to be dangerous, advised the local police but failed to warn the victim or her parents. Following the victim's murder, the psychologist was held to have breached a duty of care to the parents. "When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist . . . to warn the intended victim or others likely to apprise the victim of the danger, to notify the

police, or to take whatever other steps are reasonably necessary under the circumstances." (*Id.* at p. 431.)

It is to be noted that in *Tarasoff* the identity of the imperiled victim was known to the actor, but neither the victim nor her parents were in any posture of reliance upon the psychologist to act in their behalf. The factor of reliance, seemingly important in the police cases, is missing. A similar yet even extended concept of liability is set forth in *Myers* v. *Quesenberry* (1983) 144 Cal.App.3d 888 [193 Cal.Rptr. 733]. There a doctor was found to have breached a duty to advise a disabled patient not to drive her car. When the patient, while driving with the doctor's blessing, caused an accident and damage to third parties the doctor was found liable to the third parties. Apparently recognizing the difficulty of imposing a duty upon the actor for the benefit of unknown and unidentifiable persons, the court stated that "[t]he question of negligence liability is more accurately analyzed when the word 'duty' is eliminated, with the focus solely on the issue of whether liability should be imposed." (*Id.* at p. 891.) The court then focused on the question of foreseeability, which of course in some contexts is a question of fact for the jury. (*Id.* at p. 892.) Obviously a reasonable jury could find that a doctor who permits a patient to drive a car when physically unable to do so should foresee injury to third parties. The court thus deftly dodged the issue of duty, identifying the problem as a matter of proximate cause, which of course could not be decided on summary judgment.

The aspect of *Tarasoff* and *Myers* we find interesting is that both defendants were health care practitioners. Quoting from Fleming and Maximov, *The Patient or His Victim: The Therapist's Dilemma* (1974) 62 Cal.L.Rev. 1025, 1030-1031, the *Tarasoff* court stated, " '. . . there now seems to be sufficient authority to support the conclusion that by entering into a doctor-patient relationship the therapist becomes sufficiently involved to assume some responsibility for the safety, not only of the patient himself, but also of any third person whom the doctor knows to be threatened by the patient.' " (*Tarasoff, supra,* 17 Cal.3d at p. 437.) Thus, it appears that professionals who undertake the care and treatment of patients who may pose a danger to third parties have an obligation to take steps to control the danger, even though the identity of the third parties may not be known.

Juxtaposed against this authority is *Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278 [253 Cal.Rptr. 97, 763 P.2d 948], in which a church counselor was found not to have a duty to the parents of a counselee who committed suicide. Emphasizing the public policy considerations favoring restraint in the imposition of duties to nonprofessionals, the court stated: "Furthermore, extending liability to voluntary, noncommercial and noncustodial relationships is contrary to the trend in the Legislature to encourage private assistance efforts." (*Id.* at p. 298.)

We believe that these three cases (*Tarasoff, Myers,* and *Nally*) suggest that while professionals may have a duty to warn or take precautions to prevent injury to known, or even unknown, victims of their dangerous patients, this duty is based upon special professional expertise and is not extended to nonprofessionals attempting to assist friends or subjects with problems. Hence, even though Loo undertook significant efforts to assist Logan in his rehabilitation, by paying for his psychiatrist and convincing him to attend Alcoholics Anonymous, as a nonprofessional volunteer she should not be held to have assumed a duty of continued assistance, with respect either to Logan or to Koepke.

Having considered these somewhat peripheral authorities, we ask what conclusion can be reached concerning Loo's duty to Koepke in this case. The question might be posed in the abstract as follows: When an unrelated actor, knowing of risk to a third party because of the dangerous propensities of a tortfeasor, warns the third party of the danger and takes some steps to reduce the same, and the circumstance of risk is in fact reduced, is the actor thereafter under a duty to warn the third party when the circumstances change resulting in a resurrection of the dangerous condition? Put another way, does the voluntary assistance of a person in danger by an unrelated person impose on the assisting person any continuing obligation of continued assistance?

We are convinced that the answer to the refinely stated issue above is, in general, no. We are persuaded by such cases as *Nally* v. *Grace Community Church, supra,* 47 Cal.3d 278 and *Bill* v. *Superior Court* (1982) 137 Cal.App.3d 1002 [187 Cal.Rptr. 625] that strong public policy favors the encouragement of voluntary acts of assistance, by precluding the imposition of undefined and indefinite tag-on obligations as a consequence of the voluntarism. We have here no aspect of professional or governmental control such as to suggest a duty greater than might be imposed on the ordinary person (as in *Tarasoff*, where the status of psychologist elevates potential duty, or in *Johnson*, where the Youth Authority has special knowledge and access to information). Loo and Koepke were persons unrelated in any practical or traditional manner. Had Loo refused any communication with Koepke, from the start of the affair, she clearly could not be held responsible for the ultimate injury. When Loo volunteered information, originally in the form of a warning and later with the advice that the danger had subsided, did she thereby undertake to provide future warnings if and when circumstances changed? To impose such burden on unrelated persons with no familial, commercial, agency or other relationship would be, in our opinion, contrary to public policy.

There is one important factor in this case which appears in none of the authorities reviewed above. While Koepke and Logan were not married, their dispute was essentially a domestic dispute. Not only in law enforcement circles, but indeed to all people today, it is well known that domestic disputes are common, they are often vexatious and distressful not only to those parties to the dispute, but also to their friends and associates, and it is not uncommon that they lead to violence. The friends and associates of those involved in a domestic dispute, particularly one of this kind which results in a breakup of the relationship, commonly attempt to be of some assistance to one or both of the distressed parties. Whether such assistance is well-advised or even in the main useful is beside the point: Society, we believe, favors the attempt at such help. We should not dissuade people from trying to help those in domestic distress by fastening upon them, like Brer Rabbit to the tar baby, the obligation of continued tries just because they made one effort to assist.

For a person in Loo's situation there theoretically may be any number of reasons for withdrawing from contact with the participants in the Logan-Koepke confrontation. Warnings, advice and other communications from nonprofessionals in such situations are fraught with the danger of miscommunication, misunderstanding, and the very real possibility of diverting domestic venom from the parties in dispute to the volunteer. It is an ordinary human reaction when presented with a violent dispute between two friends to not want to "get involved." We should not prevent one from disinvolving herself because of a temporary and voluntary involvement. It can be argued, of course, that by reason of Loo's advice that she possessed Logan's gun, Koepke reasonably became reliant upon her for any new information to the contrary. We believe, however, that the circumstance does not support this as a reasonable conclusion. Loo's only action supporting any continuing obligation to act was a fleeting communication designed to assist in domestic relations. Even though this communication related to what might be thought a very important matter, it would be unreasonable for the beneficiary of that service to expect that the person volunteering such information had undertaken *any* continuing obligation to warn.

Accordingly, we find that the facts of this case imposed no duty upon Loo to take any further action to communicate with Koepke, even though Loo became aware of a change in circumstances which might cause peril to Koepke. Therefore, having no duty, Loo's failure to warn Koepke was not negligence, even though Loo might reasonably be found to have anticipated possible peril to Koepke when Logan retook possession of his gun.

## Disposition

The judgment in favor of Loo is affirmed. Loo is entitled to costs on appeal.

Kremer, P. J., and Work, J., concurred.