[No. B095945. Second Dist., Div. Two. Sept. 2, 1998.]

RENE MENDOZA, a Minor, etc., et al., Plaintiffs and Respondents, v. CITY OF LOS ANGELES, Defendant and Appellant.

1334

## COUNSEL

James K. Hahn, City Attorney, G. Daniel Woodard and Katherine J. Hamilton, Assistant City Attorneys, for Defendant and Appellant.

Robert Mann and Donald W. Cook for Plaintiffs and Respondents.

## OPINION

**NOTT, J.**—The City of Los Angeles (the City) appeals from a judgment entered in favor of Christina Sprague (as guardian ad litem for the minor Rene Mendoza) and Ahna Maglinti (referred to collectively as plaintiffs) in their action for the wrongful death of plaintiffs' mother, Clementina Maglinti. Clementina was shot to death by her fiancé, off-duty Los Angeles Police Officer Edward Mendoza, during a domestic argument in June 1989. The jury found the City 25 percent at fault and assessed economic damages of $300,000 and noneconomic damages of $850,000.

The City contends: "[I.] Plaintiffs failed to establish or prove a statutory basis for the City's liability. [II.] [The City's] motions for judgment in this case should have been granted since plaintiffs failed to prove that [the City] owed them a duty of care. [III.] [The City's] motions for judgment in this

case should have been granted since plaintiffs failed to prove that [the City] breached a duty of care. [IV.] The trial court erred in instructing the jury pursuant to Evidence Code § 669 that [the City's] actions constituted negligence per se. [V.] [The City's] motions for judgment in this case should have been granted since, as a matter of law, [the City's] negligence did not cause plaintiffs' injuries. [VI.] [The City's] motion for new trial should have been granted on the ground of improper exclusion of evidence."

After an unsuccessful motion for summary judgment and two motions for judgment on the pleadings, one of which was granted with leave to file an amended complaint, plaintiffs filed their first amended complaint against the City and Mendoza. It alleged intentional and negligent wrongful death and intentional infliction of emotional distress against Mendoza, and wrongful death against the City on the theory it negligently hired and supervised Mendoza and negligently entrusted him with the rights of a police officer, including the right to carry a concealable firearm.

## FACTS

Mendoza shot and killed Clementina in the presence of Clementina's 13-year-old daughter, Ahna. This shooting occurred late in the evening in the Hawthorne home Mendoza shared with Clementina, Ahna, and Rene, who was the couple's infant son. The couple were arguing about Mendoza's coming home late and drunk. Mendoza had left work at the end of his shift that afternoon and then had gone out drinking with friends. Mendoza was permitted, but not required, to carry a concealed firearm while off duty. He owned a revolver, which he had purchased while a cadet at the police academy. The evening of the shooting he put this revolver on the dining table, intending to clean it. In the course of a verbal argument, Mendoza shot Clementina in the face, killing her.

At the time of the shooting, Mendoza had no history of violence. According to Mendoza, he had never hit or kicked Clementina, and he did not think he would have strangled or beaten her to death. There was no evidence of past violence or difficulty with anger control. According to a Department of Corrections psychologist, the shooting occurred as a result of poor personality insight, shallow emotions, use of alcohol, poor judgment, and carelessness in the use of a firearm.

Mendoza's blood-alcohol level was 0.14 percent 90 minutes after the homicide. Mendoza drank three beers that afternoon after work and then consumed more beer plus several shots of tequila at a friend's apartment in the evening.

A Navy colleague of Mendoza's testified that while in the Navy, they drank every chance they got and often got drunk. Mendoza served in the Navy just prior to applying for work with the Los Angeles Police Department (the Department). He denied that he drank on average twice a week while in the Navy, saying there were periods when he was at sea or in schooling when he did not drink. He also testified that he did not get drunk whenever he was on leave but only occasionally.

A correctional counselor who conducted an intake interview of Mendoza in prison testified that Mendoza told her he had been drinking a six-pack of beer and two shots of tequila daily for the two years preceding the crime. Mendoza denied having told the correctional counselor this. Mendoza considered himself only slightly intoxicated when he killed Clementina. Clementina's relatives described Mendoza as a social drinker; one said he drank all the time, at least at family get-togethers.

At the time of the shooting, Mendoza had been employed by the Department for more than one year. Mendoza testified he owned no guns before he became a police officer, and he purchased the weapon because he had become a police officer. Mendoza usually carried a loaded gun with him while off duty. The Department had no regulation restricting an officer from carrying or handling a firearm while intoxicated.

Mendoza testified that he had never been disciplined while a Department officer for any reason. There was no evidence that Mendoza ever drank on the job or missed time at work because of drinking. Clementina's sister testified that Mendoza once drank beer before he went to work.

When he left the Navy, Mendoza applied to five police agencies. He was rejected by police departments in Santa Ana and Long Beach, failing to score high enough on the written test to receive an interview. Mendoza's applications to the California Highway Patrol and the Department of Corrections were pending when the Department hired him.

When Mendoza was hired, there was no departmental manual setting forth criteria for hiring suitability. Instead, there was a lengthy selection process administered by the City's personnel department. The process included a written exam, a civil service interview, a medical exam, a physical abilities test, a personal history questionnaire and a Department interview. The applicant was then given a psychological exam which included a personal interview. After an applicant had qualified, a background investigation was conducted by the Department.

As part of the psychological evaluation, Mendoza completed an MMPI (Minnesota Multiphasic Personality Inventory) test. The McAndrews supplementary scale, which is part of the MMPI, tests for alcohol abuse. Mendoza's score on that scale was 26. Dr. Sheldon Kay explained that although using 24 as the indicator for alcohol abuse would identify approximately 82 percent of alcoholic and nonalcoholic psychiatric patients, it would also identify a large segment of false positives. In his use of the scale among nonmental patients, he used a score of 28 as indicating a possible alcohol abuser or a person with an extremely extroverted personality. A second psychologist, Paul Berg, testified that a score of 26 should have raised a red flag regarding possible alcohol abuse, particularly in conjunction with Mendoza's having admitted he first used alcohol before the age of 13 and first became drunk before the age of 16. Dr. Kay failed to maintain any written report of his evaluation of Mendoza and any record of his interview with Mendoza.

Mendoza provided the Department with four personal references. The Department obtained written questionnaires from the four but did not interview them. Neither the primary references nor the past employer check turned up any damaging or critical information. The personal references described Mendoza as a "social drinker" who drank "within reason." Mendoza reported that he consumed three to five drinks per week, an amount the Department considered within normal limits.

The primary references provided secondary references. The City did not contact the secondary references. The California Commission on Peace Officer Standards and Training (POST) in 1987 required background investigators to contact secondary references "within practical limits." Patrick Maher, a personnel consultant, testified that the failure to try to contact secondary references fell below the standard of care of police background investigators in 1989.[1]

The Department's practice in 1987 was to contact secondary references only if they needed more information. The investigator who worked on

---

[1] The trial court instructed the jury as follows in connection with the POST manual:

"Title 11 of the California Code of Regulations provides that the background investigation shall be conducted as prescribed in the Post Administrative Manual Section C-1. [¶] Section C-1, of the Post Administrative Manual provides in part: 1-5. Sources of Investigation: The investigation shall include an inquiry into the following sources of information for the purpose indicated: [¶] (h) Within practical limits, references supplied by the candidate, and other references supplied by them, if any—to determine whether or not the candidate has exhibited behavior which would or would not be compatible with the position sought."

"If you find that a party to this action violated Section C-1 of the Post Administrative Manual, the [regulation] just read to you [and that such violation was a cause of injury to another, you will find that such violation was negligence] [unless such party proves by a preponderance of the evidence that it did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law.

Mendoza's application testified that he did not have the resources to contact the secondary references, although he would have done so if there had been some reason which required a follow-up, such as negative information.

Under POST standards, the Department also should have determined why two other law enforcement agencies had found Mendoza unacceptable. There was conflicting evidence regarding whether Mendoza's file indicated the Department had contacted the agencies to which Mendoza applied for employment. It is undisputed that Mendoza had not passed the initial written tests for the two agencies which rejected him.

DISCUSSION

I. *Duty*

The elements of a cause of action for negligence are (1) a legal duty to use reasonable care, (2) breach of that duty, and (3) proximate cause between the breach and (4) the plaintiff's injury. (*Wattenbarger* v. *Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746, 751 [33 Cal.Rptr.2d 732].) The trial court's determination that a duty exists is reviewed de novo by the appellate court as a question of law. (*Koepke* v. *Loo* (1993) 18 Cal.App.4th 1444, 1450-1451 [23 Cal.Rptr.2d 34].)

Duty is the expression of a court's conclusion that a particular plaintiff is entitled to protection. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) It is based upon a balancing of factors: the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the conduct and the injury, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with liability for breach, and the availability and prevalence of insurance. (*Randi W.* v. *Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1077 [60 Cal.Rptr.2d 263, 929 P.2d 582]; *Rowland* v. *Christian, supra,* at p. 113.)

Liability for negligent hiring and supervision is based upon the reasoning that if an enterprise hires individuals with characteristics which might pose a danger to customers or other employees, the enterprise should bear the loss caused by the wrongdoing of its incompetent or unfit employees. The tort has developed in California in factual settings where the

In order to sustain such burden of proof, such party must prove by a preponderance of the evidence that it was faced with circumstances which prevented compliance or justified noncompliance with the [regulation]]."

plaintiff's injury occurred in the workplace, or the contact between the plaintiff and the employee was generated by the employment relationship. (See North, *The Responsibility of Employers for the Actions of their Employees: The Negligent Hiring Theory of Liability* (1977) 53 Chi.-Kent L.Rev. 717, 719.)

In cases where the employee was an off-duty police officer, some courts have found police departments liable for the employee's acts of violence against members of the general public. The departments were held liable where the employees' acts were made possible by the use of the officers' service revolvers which they were required to carry at all times. (*Marusa* v. *District of Columbia* (D.C. Cir. 1973) 484 F.2d 828 [157 App.D.C. 348] [common law liability could exist where a drunk officer shot a stranger outside a bar]; *Corridon* v. *City of Bayonne* (1974) 129 N.J.Super. 393 [324 A.2d 42] [inebriated officer in uniform killed a stranger in a bar; officer had previously engaged in several episodes of armed public drunkenness known to the department]; *McCrink* v. *City of New York* (1947) 296 N.Y. 99 [71 N.E.2d 419] [drunk officer wounded one neighbor and killed a second during a paranoid episode; officer had previously received three reprimands for inebriation, once on duty].)

*Bonsignore* v. *City of New York* (2d Cir. 1982) 683 F.2d 635 is similar to the present case, in that an off-duty officer shot his wife. He then killed himself. Applying New York law, the court found liability. It reasoned: "The City could reasonably have anticipated that its negligence in failing to identify officers who were unfit to carry guns would result in an unfit officer injuring someone using the gun he was required to carry. Furthermore, it was reasonably foreseeable that such an officer would injure a member of his own family. . . . Since the City was negligent precisely because of the risk posed to other policemen and members of the public by requiring all officers, without adequate screening, to be armed at all times, the District Court did not err in denying the City's motion for judgment n.o.v. or a new trial." (*Id.*, at p. 638.) As in the previously cited cases, however, the officer inflicted the injury with his service revolver, which he was required to carry at all times. In addition, the officer had displayed many signs of mental or emotional problems, such as excessive sick leave and incomplete performance reports.

Here, Mendoza did not use his service revolver and was not required to be armed at all times. In that respect, the present case is analogous to *Bohmfalk* v. *City of New Orleans* (La.Ct.App. 1993) 628 So.2d 1143, in which the court found no liability for a shooting by a drunk off-duty police officer utilizing a gun which belonged to a family member. (And see *Conroy* v. *City*

*of Ballwin* (Mo.Ct.App. 1986) 723 S.W.2d 476 [officer shot a hunter during target practice]; *Braswell* v. *Braswell* (1991)330 N.C. 363 [410 S.E.2d 897] [officer killed his wife during a domestic dispute].) In addition, we reject the notion that notice of alcohol abuse is the equivalent of notice of violent temperament, making foreseeable a shooting in a drunken rage.

We have been directed to no California case imposing liability for negligent hiring or supervision in favor of an employee's family member. (See *Rahmel* v. *Lehndorff* (1904) 142 Cal. 681 [76 P. 659] [a waiter assaulted a patron in the restaurant]; *Underwriters Ins. Co.* v. *Purdie* (1983) 145 Cal.App.3d 57 [193 Cal.Rptr. 248] [liquor store employee shot a delivery person while on the job]; *Evan F.* v. *Hughson United Methodist Church* (1992) 8 Cal.App.4th 828 [10 Cal.Rptr.2d 748] [pastor sexually molested a child parishioner]; *Najera* v. *Southern Pac. Co.* (1961) 191 Cal.App.2d 634 [13 Cal.Rptr. 146] [decided under the Federal Employers' Liability Act; employee assaulted a foreman at work]; *Monty* v. *Orlandi* (1959) 169 Cal.App.2d 620 [337 P.2d 861] [bartender struck a patron at the bar].) Failing to require a connection between the employment and the injured party would result in the employer becoming an insurer of the safety of every person with whom its employees come into contact, regardless of their relationship to the employer. While there may be such a connection between an officer required to be armed at all times and members of the public, there is no such relationship between an officer not required to be armed and his family.

There was no evidence of intentional or reckless misconduct by the City. The absence of any evidence of past violence makes it entirely speculative before the fact of any foreseeable connection between Mendoza's alcoholism and a propensity to undertake a criminal attack. There is no close connection between the City's acts and the shooting more than a year later or between the City's failure to counsel Mendoza not to use his gun while drinking and his criminal attack. Any moral blame attached to the City's failure to make a more thorough investigation of Mendoza's background for evidence of alcohol abuse is slight in light of his apparently unblemished prior record. It is not clear that creating a liability in such a situation would have any future ameliorative effect, other than to make unemployable persons who use alcohol. Insurance may be available for negligent hiring, although presumably not directly for the criminal conduct of employees acting outside the course and scope of their employment. We conclude, after carefully weighing the factors set forth in *Rowland* v. *Christian, supra,* 69 Cal.2d 108, that the City did not owe a duty to plaintiffs in connection with its hiring and supervising Mendoza.

## II. *Causation*

The jury found that the City was negligent in its hiring Mendoza, supervising him, or entrusting him with the rights of a police officer, including the right to carry a concealable weapon and that such negligence was a legal cause of plaintiffs' injury. Assuming the evidence was sufficient to support the finding of negligence (and even if we held it had a duty in this factual setting not to be), it was insufficient to support the finding of causation. Neither rejecting Mendoza nor firing him would have eliminated his access to a gun. The gun used by Mendoza was not his service weapon, and he was not required to carry a weapon when off duty. Mendoza was both off duty and in Hawthorne, outside the jurisdiction of the Department, when he shot Clementina during a domestic dispute. The act was unrelated to his official duties. Like any private citizen, Mendoza was entitled to keep firearms in his home. We find no merit in the argument that but for the City's hiring of Mendoza and failing to tell him not to use a gun while drinking, Clementina probably would not have been shot by Mendoza.

In addition to not being a "but for" cause, Mendoza's employment as a police officer was not a substantial factor that can be said to be a proximate cause of Clementina's death. ▮ Like duty, proximate cause reflects a judgment regarding the permissible extent of liability for negligence. (See *Brewer* v. *Teano* (1995) 40 Cal.App.4th 1024, 1030 [47 Cal.Rptr.2d 348].) It limits the defendant's liability to those foreseeable consequences that the defendant's negligence was a substantial factor in producing. ▮ The fact that Mendoza may have shown signs of abusing alcohol is insufficient to establish that the City should have foreseen that he would on a drunken spree shoot Clementina. Mendoza had no history of past violence or excessive use of force. Mendoza's unforeseeable private act broke the chain of proximate cause connecting the City's negligence to Clementina's death. (See *Huffman* v. *County of Los Angeles* (9th Cir. 1998) 147 F.3d 1054 [requiring deputies to carry a gun off duty and failing to prohibit them from carrying a gun while drinking did not violate the decedent's constitutional rights where the County could not have foreseen the off-duty officer's drunken private action in shooting a man during a barroom brawl].)

In light of our holdings on the preceding issues, we need not address the additional issues raised by the City.

Our decision does not affect the money judgment against Mendoza, who is not a party to this appeal.

### Disposition

The judgment against the City of Los Angeles is reversed. The trial court is directed to enter judgment in favor of the City of Los Angeles. Costs to appellant.

Boren, P. J., and Zebrowski, J., concurred.

A petition for a rehearing was denied September 29, 1998, and respondents' petition for review by the Supreme Court was denied December 16, 1998.