Filed 11/26/13  Brown v. Modaffari CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SCOT BROWN,<br><br>    Plaintiff and Appellant,<br><br>      v.<br><br>JOHN A. MODAFFARI et al.,<br><br>    Defendants and Appellants. | G047443<br><br>(Super. Ct. No. 30-2010-00378040)<br><br>O P I N I O N |

Appeal from a judgment and postjudgment order of the Superior Court of Orange County, Robert J. Moss, Judge.  Affirmed in part, reversed in part, and remanded.

Law Offices of Edward A. Dzwonkowski, Edward A. Dzwonkowski and Russ E. Boltz for Defendants and Appellants.

Alston, Alston & Diebold, Michael F. Long and Donald A Diebold for Plaintiff and Appellant.

\*   \*   \*

This action arises from an agreement for defendants and appellants John A. Modaffari and Exclusive Property Management (Exclusive Property; collectively Defendants) to manage two apartment buildings plaintiff and appellant Scot Brown owned with his wife Cheryl Brown.[1] Defendants assigned Jorge Rodriguez to manage the properties on their behalf for nearly 10 years, but he failed to properly do so in many ways. Scot discovered the mismanagement and filed this action after Rodriguez failed to make the mortgage payments on the properties and the lenders initiated foreclosure proceedings. Following a bench trial, the court awarded Scot approximately $186,000 for rent Rodriguez failed to collect and physical damage he caused to the properties by failing to perform ordinary maintenance and repairs. Both Defendants and Scot appeal from the trial court's judgment and a postjudgment order.

Defendants contend the statute of limitations and various provisions in their agreement with Scot either barred his claims entirely or significantly limited the damages he could recover. Defendants also contend Scot's claim failed because he either knew or should have known about Rodriguez's mismanagement and did nothing to prevent it. As more fully explained below, we conclude Defendants' appeal lacks merit.

On his cross-appeal, Scot contends the trial court erred by failing to award him the full amount of damages he sought and denying his motion for attorney fees. As more fully explained below, we conclude the trial court erred in denying Scot damages for "[m]issing rent never deposited," but otherwise properly determined the amount of damages Scot suffered and properly denied Scot's attorney fee motion.

---

[1] We refer to Scot and his wife Cheryl by their first name to avoid confusion; no disrespect is intended. (*Martin v. PacifiCare of California* (2011) 198 Cal.App.4th 1390, 1393, fn. 1.) We refer to Scot and Cheryl collectively as the Browns.

2

# I

## FACTS AND PROCEDURAL HISTORY[2]

Modaffari is a licensed real estate broker and property manager doing business as Exclusive Property. In April 1999, the Browns entered into a "Property Management Agreement" (Agreement) with Exclusive Property. Although only Cheryl signed the Agreement for the Browns, it designated both Scot and Cheryl as the property owners and Scot initialed every page of the Agreement. Rodriguez signed and initialed the Agreement on Exclusive Property's behalf. Rodriguez was a licensed real estate salesperson working under Modaffari's broker's license.

The Agreement appointed Exclusive Property as the property manager for a four-unit apartment building the Browns owned in Huntington Beach. Although the Agreement did not refer to a second four-unit apartment building the Browns owned in Costa Mesa, Exclusive Property also managed that property for the Browns under the Agreement's terms. In general, the Agreement required Exclusive Property to rent the apartment units, collect rent, deposit all rent and other payments in a trust account for the properties, make all mortgage and insurance payments on the properties, and maintain the

---

[2] Defendants' opening brief contains virtually no citations to the appellate record. It cites the trial court's decision and the contract between the parties, but does not include a single citation to the four volume reporter's transcript or any other evidence from the trial. Indeed, the opening brief makes countless factual assertions regarding what the evidence at trial purportedly showed, but fails to support those assertions with record citations. We disregard all such assertions, which include almost all of Defendants' statement of facts. (*Dominguez v. Financial Indemnity Co.* (2010) 183 Cal.App.4th 388, 392, fn. 2; *Gotschall v. Daley* (2002) 96 Cal.App.4th 479, 481, fn. 1.) As explained below, the failure to provide record citations also results in Defendants waiving some of their challenges to the trial court's judgment. (*Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 384 (*Lonely Maiden*); *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 (*Guthrey*).) We acknowledge Defendants' reply brief provides some record citations that were not included in the opening brief, but the reply still makes numerous factual assertions without any support.

properties. In return, the Agreement authorized Exclusive Property to pay itself five percent of the gross collections.

Rodriguez managed the two properties on Exclusive Properties' behalf without any involvement, training, or instructions from Modaffari. In doing so, Rodriguez dealt exclusively with Cheryl; Scot had no involvement in the properties. Rodriguez spoke with Cheryl on the phone when an issue arose and sent her periodic cash flow reports reflecting the properties' income and expenses. Although she often spoke with Rodriguez, Cheryl rarely visited the properties.

The cash flow reports Rodriguez sent Cheryl did not accurately reflect the true income and expenses for the properties. The reports repeatedly and falsely stated Rodriguez received and deposited all monthly rental payments for the properties. For example, when a tenant failed to make a monthly payment, Rodriguez often would not contact the tenant to collect the rent, but he would report he received it. Similarly, if a tenant's rent check was returned for insufficient funds, Rodriguez would report receiving the payment without ever attempting to collect the rent. Thus, several tenants were allowed to remain in units without paying rent. Rodriguez also failed to maintain the buildings in a reasonable condition or keep records regarding the tenants, the leases, or work performed on the properties. At trial, Rodriguez conceded he did not do his job because he was experiencing problems in his personal life.

When Cheryl passed away from cancer in 2007, Rodriguez reported to Scot and continued to manage the properties in the same manner, filing reports falsely claiming he had collected the rent and performed the necessary maintenance. In late 2008, the property insurance was cancelled when Rodriguez failed to pay the insurance premium. In January 2009, Rodriguez stopped making the mortgage payments on the properties and the loans went into default. Scot was unaware of these events because the insurance company and lender communicated only with Rodriguez and Exclusive Property as Scot's designated agents.

4

In February 2009, Defendants fired Rodriguez because Modaffari was retiring and wanted to cancel Exclusive Property's management contracts. Neither Modaffari nor Rodriguez, however, notified Scot that Rodriguez had been terminated and was no longer affiliated with Exclusive Property. After his termination, Rodriguez retained the documents for Scot's properties and continued to manage the properties in the same manner.

In May 2009, Scot discovered the mortgages on the two properties were in default when he ran his own credit report and discovered his credit score had dropped dramatically. He immediately contacted Rodriguez to find out what had happened and the two men met in June 2009 to discuss the properties. Rodriguez apologized for what he had done and promised to "make it right." He gave Scot a disorganized box of miscellaneous property documents and a check for $11,800, but did not explain the scope of the problems he had created.

After the meeting, Scot cured the defaults on the mortgages and hired a new property management company. He worked with that company to audit and recreate the records for the properties to determine how much rent Rodriguez had failed to collect. They also inspected the two properties and discovered the properties needed substantial repairs because Rodriguez had failed to perform regular maintenance. For example, both properties required significant mold abatement and balconies, stairwells, and other structural components also had to be replaced. The extent of the repairs required Scot to relocate the tenants temporarily.

Scot sued Rodriguez and Defendants in June 2010. The operative pleading alleges breach of contract, negligence, and negligent supervision against Defendants, and breach of contract, fraud, and conversion against Rodriguez. Scot settled with Rodriguez and the trial court conducted a bench trial on the claims against Defendants. At trial, Scot sought (1) approximately $286,000 for repairs to the properties; (2) approximately $20,000 for the arrearages on the mortgages; (3) approximately $94,000 for "[m]issing

5

rent"; and (4) approximately $25,000 for "[m]issing rent never deposited." The total damages sought were approximately $425,000.

In May 2012, the trial court issued its tentative decision, finding Defendants breached the Agreement, breached the fiduciary duties they owed Scot, and negligently supervised Rodriguez in his management of the properties. The court awarded Scot a total of $186,495: (1) $92,601 for repairs required by Rodriguez's failure to perform regular maintenance on the properties; and (2) $93,894 as the difference between the rent Rodriguez reported receiving and the amount he deposited in the trust account Defendants established for the Browns' properties. Both Scot and Defendants requested the trial court issue a statement of decision explaining the factual and legal basis for its verdict. Scot also filed objections to the court's tentative decision.

In July 2012, the court issued its final statement of decision and entered judgment against Defendants for $186,495. As the prevailing party, Scot sought to recover nearly $180,000 in attorney fees based on an attorney fee provision in the Agreement. The trial court denied that motion, finding Scot failed to meet the condition precedent to a fee award under the Agreement because he did not seek to mediate the dispute before filing this action. Defendants timely appealed from the trial court's judgment and Scot cross-appealed based on the court's decision denying him certain damages and his attorney fees.

II

DISCUSSION

A.    *Defendants' Appeal*

1.    The Agreement's Indemnity Provision Did Not Bar Scot's Claims

Defendants contend all of Scot's claims are barred because he agreed to indemnify and hold Defendants harmless from all claims relating to their management or operation of the properties. According to Defendants, the Agreement's indemnity

6

provision provides that Scot will hold Defendants free from liability for any claims "'by any person . . . including Owner'" for "'the performance or exercise of any of the duties, powers, or authorities granted by Broker.'" (Italics omitted.) Defendants take this language out of context and ignore the governing contract interpretation principles.

The Agreement's indemnity provision provides, "[Scot] shall [¶] . . . [¶] Indemnify, defend and hold harmless [Defendants], and all persons in [Defendants'] firm, regardless of responsibility, from all costs, expenses, suits, liabilities, damages, attorney's fees, and claims of every type, including but not limited to those arising out of injury or death of any person, or damage to any real or personal property of any person, including [Scot], in any way relating to the management, rental, security deposits, or operation of the Property by [Defendants], or any person in [Defendants'] firm, or the performance or exercise of any of the duties, powers, or authorities granted to [Defendants]."

We construe a contractual indemnity provision under ordinary rules of contract interpretation. (*Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1025 (*Zalkind*).) "'The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. [Citation.] "The words of a contract are to be understood in their ordinary and popular sense."' [Citation.] When, as in this case, no extrinsic evidence is introduced, the appellate court independently construes the contract. [Citation.]" (*Id*. at p. 1022.)

Indemnity provisions ordinarily apply to third party claims only: "'A clause which contains the words "indemnify" and "hold harmless" is an indemnity clause which generally obligates the indemnitor to reimburse the indemnitee for any damages the indemnitee becomes obligated to pay third persons. [Citation.]'" (*Zalkind*, *supra*, 194 Cal.App.4th at p. 1024.) "Although indemnity generally relates to third party claims, 'this general rule does not apply if the parties to a contract use the term "indemnity" to include direct liability as well as third party liability.' [Citation.]" (*Ibid*.)

7

When a contracting party asserts an indemnity provision releases or exculpates that party from liability to the other contracting party, "courts must look for clear, unambiguous and explicit language not to hold the released party liable." (*Queen Villas Homeowners Assn. v. TCB Property Management* (2007) 149 Cal.App.4th 1, 5 (*Queen Villas*).) Indeed, contracting parties may use an indemnity provision to release one contracting party from liability to the other, but the language must be clear and the intent unmistakable because "exculpatory clauses are construed against the released party." (*Id*. at p. 6.)

In *Queen Villas*, a homeowners' association sued its property management company for breaching its professional and contractual duties to the association by allowing an association board member to pay herself more than $100,000 for professional services she allegedly rendered to the association. (*Queen Villas*, *supra*, 149 Cal.App.4th at pp. 3-4.) The trial court concluded an indemnity provision in the association's contract with the management company barred the claims. We reversed because the indemnity provision's language did not reflect an intent "that would require a court to interpret the words 'indemnify' or 'hold harmless' . . . beyond the usual context of third party indemnification." (*Id*. at pp. 6-8.)

We explained only one case—*Rooz v. Kimmel* (1997) 55 Cal.App.4th 573 (*Rooz*)—held an indemnity provision exculpated a contracting party from liability to the other contracting party. (*Queen Villas*, *supra*, 149 Cal.App.4th at p. 6.) In *Rooz*, a title company recorded a trust deed for the plaintiff as part of a related transaction it was recording for another customer. The title company offered to record the trust deed to accommodate the plaintiff free of charge, but the company would do so only after the plaintiff agreed to indemnify the title company. Plaintiff sued the title company for damages when problems with the related transaction forced the title company to delay recording the plaintiff's trust deed. (*Queen Villas*, at p. 7, quoting *Rooz* at p. 586.)

8

The *Rooz* court enforced the indemnity provision as an exculpatory clause because "the 'commercial reality of the accommodation recording' showed that the parties *intended* for the indemnity clause to release the defendant title company." (*Queen Villas*, *supra*, 149 Cal.App.4th at p. 7, quoting *Rooz*, *supra*, 55 Cal.App.4th at p. 586, original italics.)  Specifically, the indemnity provision's language "'made it clear'" the recording was a "'"favor"'" performed without charge and the title company agreed to do so "'only'" because the plaintiff agreed to exonerate the title company from all liability arising out of the recording. (*Queen Villas*, at p. 7, quoting *Rooz* at p. 586.)  The *Rooz* court explained that failure to enforce the indemnity provision as an exculpatory clause would deprive the title company of the benefit of its bargain. (*Ibid*.)  In *Queen Villas*, we concluded there was no comparable language or expression of intent in the indemnity provision that removed it from the general rule that indemnity provisions only apply to third party claims. (*Queen Villas*, at pp. 7-8.)

Here, we also conclude the language in the Agreement's indemnity provision does not reflect an intent "that would require a court to interpret the words 'indemnify' or 'hold harmless' [in the Agreement] beyond the usual context of third party indemnification." (See *Queen Villas*, *supra*, 149 Cal.App.4th at p. 7.)  Indeed, the Agreement's indemnity provision is not a specially drafted provision designed to reflect the parties' unique intent that the provision apply outside the usual third party indemnification context.  To the contrary, the indemnity provision is part of a form property management agreement the California Association of Realtors drafted for broad use in a wide variety of property management situations.  The commercial reality of the transaction between Defendants and Scot shows that Defendants did not specifically require Scot exculpate them from all liability arising out of their services.  Scot hired Defendants to perform professional services and Defendants were compensated for those services.  Defendants' interpretation of the indemnity provision would allow them to

breach their contractual and professional duties with impunity. Nothing shows that was the parties' intent.

Defendants contend the indemnity provision applies to Scot's claims against them because it contains the words "including Owner" after the clause "damage to any real or personal property of any person." That clause, however, does not describe whose claims are covered by the indemnity provision, but rather the type of claims that are covered—"claims of every type, including but not limited to those arising out of injury or death of any person, or damage to any real or personal property of any person, *including Owner*." (Italics added.) Accordingly, this language expresses the intent that the indemnity provision applies to claims arising out of damage to anyone's property, including Scot's, but it does not express the intent that the indemnity provision exculpates Defendants from any and all liability to Scot. Indeed, this language does not remove the Agreement's indemnity provision from the usual context of indemnification against third party claims.

Finally, Defendants contend the indemnity provision in *Zalkind* is "functionally the same" as the Agreement's indemnity provision and therefore we should follow *Zalkind* and enforce the provision as an exculpatory clause. Defendants make no attempt to analyze or compare the language of the provision in *Zalkind* to the indemnity provision in its contract with Scot. *Zalkind* involved a specially drafted indemnity provision in a $2 million asset purchase agreement that required the buyer to indemnify and hold harmless the sellers from any damages or losses that arose from the buyer's breach of the asset purchase agreement. (*Zalkind*, *supra*, 194 Cal.App.4th at pp. 1018, 1023.) Accordingly, rather than exculpate any party from liability for injuries it caused, the provision provided the buyer would indemnify the seller from any losses the buyer caused the seller to suffer. *Zalkind* does not support Defendants' position.

10

2. The Statute of Limitations Does Not Bar Scot from Recovering Damages

Defendants argued at trial that the statute of limitations barred recovery for damages Scot suffered more than either two or four years before he filed this action depending on the particular claim and the governing statute of limitations. As stated in its statement of decision, the trial court rejected this argument because "Rodriguez concealed his improper conduct by submitting false cash flow reports to the Browns. [Scot] was not aware of the inadequate management and had no reason to be aware until the summer of 2009 when he fortuitously learned that the property loans were in default."

Defendants contend the trial court erred in finding the discovery rule excused Scot's failure to bring this action earlier because the court's finding was factually incorrect and did not address all the damages Scot sought. According to Defendants, the trial court's finding that Rodriguez's false cash flow reports concealed his improper conduct only addressed Scot's claims for lost rent; it did not address Scot's claims for the repairs necessitated by Rodriguez's failure to maintain the properties and therefore Scot's damages for those repairs are time-barred. Defendants also argue Scot and Cheryl knew or should have known about the condition of the properties much earlier than 2009, and therefore Scot cannot claim the benefit of the discovery rule on the repair damages. These arguments fail for two reasons.[3]

First, the trial court's finding the discovery rule applied is not limited to Scot's claims for lost rent. Although the trial court's statement of decision specifically refers to Rodriguez concealing his improper conduct by submitting false cash flow reports, it also states Scot was unaware of Rodriguez's malfeasance until the summer of 2009. This later finding is not limited to the lost rent damages and Defendants fail to

---

[3] Defendants do not specifically argue the trial court's delayed discovery ruling was improper as to Brown's lost rent damages and therefore Defendants waive any claim those damages are time-barred. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

point to anything in the record to show they brought any purported ambiguity in this finding to the trial court's attention. (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 59 (*Fladeboe*) ["if a party fails to bring omissions or ambiguities in the statement of decision's factual findings to the trial court's attention, then 'that party waives the right to claim on appeal that the statement was deficient in these regards,' and the appellate court will infer the trial court made implied factual findings to support the judgment"].)

Second, Defendants cite no evidence in the record to support their contention the Browns knew or should have known about the condition of the properties. Although Defendants contend the "trial evidence" was "undisputed" that "[Cheryl] was fully familiar with the condition of the properties, the rent rolls, leases, and every other aspect of . . . Rodriguez's performance, and that both [Cheryl and Scot] had inspected the premises," Defendants fail to cite any trial evidence to support this assertion. We therefore treat this contention as waived. (*Lonely Maiden*, *supra*, 201 Cal.App.4th at p. 384 ["'It is the duty of counsel to refer the reviewing court to the portion of the record which supports appellant's contentions on appeal. [Citation.] If no citation "is furnished on a particular point, the court may treat it as waived"'"]; *Guthrey*, *supra*, 63 Cal.App.4th at p. 1115 [same].)

In the reply, Defendants for the first time cite Scot's trial testimony to show he never attempted to learn anything about either the rent for the properties or their condition until the summer of 2009. The implicit argument underlying Defendants' citation to this evidence is that Scot had a duty to check on the properties and discover Rodriguez's failure to properly maintain them well before he learned of Rodriguez's malfeasance. Defendants, however, fail to recognize the fiduciary duty they owed to Scot excused him from any duty to check on his properties. Because of this duty, Defendants bore the burden to prevent application of the discovery rule by showing Scot had actual knowledge of the properties' condition.

12

The discovery rule typically applies when a fiduciary or confidential relationship exists between the plaintiff and the defendant. "'The fiduciary relationship carries a duty of full disclosure, and application of the discovery rule "prevents the fiduciary from obtaining immunity for an initial breach of duty by a subsequent breach of the obligation of disclosure." [Citation.]'" (*Parsons v. Tickner* (1995) 31 Cal.App.4th 1513, 1526.) Consequently, "'If the plaintiff and defendant are in a confidential relationship there is no duty of inquiry until the relationship is repudiated. The nature of the relationship is such as to cause the plaintiff to rely on the fiduciary, and awareness of facts which would ordinarily call for investigation does not excite suspicion under these special circumstances. . . . [Citation.]' [Citation.]" (*Lee v. Escrow Consultants, Inc.* (1989) 210 Cal.App.3d 915, 921 (*Lee*).) Defendants cite no evidence to show Scot knew his properties needed repairs before the summer of 2009 and therefore they failed to show the trial court erred in applying the discovery rule.

Finally, Defendants argue the discovery rule only applies to tort claims, not breach of contract claims. Not so. Although it is most often applied to tort claims, "'the discovery rule may be applied to breaches [of contract] which can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time.'" (*Gryczman v. 4550 Pico Partners, Ltd.* (2003) 107 Cal.App.4th 1, 4-5; *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 832.) Moreover, Scot asserted both tort and contract claims and the trial court awarded the same damages on all claims.

3. Whether Defendants Knew or Should Have Known Rodriguez Was Unfit to Manage the Properties Does Not Affect Scot's Recovery

Defendants contend the trial court erred in finding them liable for negligently supervising Rodriguez and his management of the properties. According to Defendants, Scot's negligent supervision claim required the trial court to find Defendants knew, or should have known, Rodriguez was unfit to manage Scot's properties. Because

13

the trial court did not make that essential finding (and the evidence allegedly would not support that finding), Defendants contend Scot's negligent supervision claim failed as a matter of law. Defendants, however, ignore the contractual and fiduciary obligations they owed to Scot to manage the properties, and the liabilities they faced for breaching those duties whether or not they were negligent in supervising Rodriguez.

The parties to the Agreement are the Browns as the owners and Exclusive Property. Rodriguez signed the Agreement on Exclusive Property's behalf, but Modaffari testified he authorized Rodriguez to do so. Accordingly, the Agreement imposed both contractual and fiduciary duties on Exclusive Property to competently manage the Browns' properties. Although Defendants were allowed to delegate those contractual and fiduciary duties to Rodriguez as their agent (Civ. Code, § 2304),[4] Defendants remained ultimately liable for any breach of those duties (§ 2330). Because Rodriguez was acting on Exclusive Property's behalf to perform Exclusive Property's contractual and fiduciary obligations, Exclusive Property is liable for any breach of those obligations whether or not Exclusive Property knew or should have known Rodriguez was unfit to manage the properties.

The cases Defendants cite are readily distinguishable because they involve plaintiffs who suffered personal injuries at the hands of a defendant's agent or employee. In *Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133, 1136-1137, the plaintiff sued a plumbing company after one of its former employees killed the plaintiff's mother. In *Mendoza v. City of Los Angeles* (1998) 66 Cal.App.4th 1333, 1335-1336, the plaintiff sued a city after one of its off-duty police officers fatally shot the plaintiff's mother. Finally, in *Noble v. Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654, 656-657, the plaintiff sued a company after an investigator its attorney hired snuck into the plaintiff's hospital room to obtain information from the plaintiff about an injury she had suffered in

_____

[4]    All statutory references are to the Civil Code unless otherwise stated.

14

the company's store. As *Mendoza* explained, "Liability for negligent hiring and supervision is based upon the reasoning that if an enterprise hires individuals with characteristics which might pose a danger to customers or other employees, the enterprise should bear the loss caused by the wrongdoing of its incompetent or unfit employees." (*Mendoza*, at p. 1339; see also *Phillips*, at p. 1139; *Noble*, at pp. 663-664.) None of these cases involved a principal who assumed contractual and fiduciary duties to the plaintiff and then delegated performance of those duties to an agent without supervising the agent to ensure the principal's duties were performed.

The outcome here would not change even if Defendants' argument on the negligent supervision claim had merit. Besides finding Defendants negligently supervised Rodriguez, the trial court also found Defendants breached the Agreement and the fiduciary duties they owed Scot. The court awarded Scot the same damages on all of these claims and Defendants failed to challenge their direct liability under the breach of contract claim and the breach of fiduciary duty claim.

4. The Doctrine of Imputed Knowledge Does Not Bar Scot's Claims

Defendants contend the doctrine imputing an agent's knowledge to his or her principal defeats all of Scot's claims as a matter of law. The trial court found that Scot was unaware Rodriguez failed to collect all of the rent and properly maintain the properties. According to Defendants, the imputed knowledge doctrine precluded the court from making that finding because Rodriguez's knowledge that he mismanaged the properties should have been imputed to Scot through the agency relationships between Scot and Defendants, and Defendants and Rodriguez. This argument fails because it improperly seeks to apply the imputed knowledge doctrine to claims between the principal and agent rather than to the claims of third parties.

"'"The general rule is well settled that the knowledge of the agent in the course of his [or her] agency is the knowledge of the principal. [Citation.] It rests on the

15

assumption that the agent will communicate to his [or her] principal all information acquired in the course of his [or her] agency, and when the knowledge of the agent is ascertained the constructive notice to the principal is conclusive. [Citation.]"' [Citations.]" (*In re Marriage of Cloney* (2001) 91 Cal.App.4th 429, 439; see also § 2332 ["As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other"].)

"'The fact that the knowledge acquired by the agent was not actually communicated to the principal, . . . does not prevent operation of the rule . . . . The agent may have been guilty of a breach of duty to his principal, yet the knowledge has the same effect *as to third persons* as though his duty had been faithfully performed.'" (*Powell v. Goldsmith* (1984) 152 Cal.App.3d 746, 751, italics added.)

"'The underlying reason for [the imputed knowledge doctrine] is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest. But this general rule does not apply when the third party knows there is no foundation for the ordinary presumption,—when he is acquainted with circumstances plainly indicating that the agent will not advise his principal. *The rule is intended to protect those who exercise good faith, and not as a shield for unfair dealings*. [Citations.]'" (*Sands v. Eagle Oil & Refining Co.* (1948) 83 Cal.App.2d 312, 319-320, italics added (*Sands*).)

Accordingly, the doctrine prevents a principal from defeating a third party's claim by asserting the principal's agent never shared the information necessary to establish liability against the principal. The doctrine does not apply when the claim is between the principal and the agent. "[I]t is well established that where the agent acts in his own interest or *where the interest of the agent is adverse to his principal, the knowledge of the agent will not be imputed to the principal* [citations]." (*People v. Park* (1978) 87 Cal.App.3d 550, 566, original italics.) "'As between two innocent parties,

16

notice to the agent of one is notice to the principal, but, as between the principal and the fraudulent agent, notice of another agent should not be imputed to the principal.'" (*Sands*, *supra*, 83 Cal.App.2d at p. 320; see *Meyer v. Glenmoor Homes, Inc.* (1966) 246 Cal.App.2d 242, 264 ["A corporation is not chargeable with the knowledge of an officer who collaborates with an outsider to defraud it"].)

Here, Defendants improperly seek to apply the imputed knowledge doctrine as between a principal (Scot) and a subagent (Rodriguez) to defeat the principal's claims against the intermediate agents (Defendants). They cite no authority applying the doctrine under these circumstances and the foregoing authorities establish that it does not apply in this context. Indeed, if the imputed knowledge doctrine applied to claims between the principal and the agent, it would bar claims for fraud, breach of fiduciary duty, and many others as between a principal and agent, and would allow an agent to breach his or her duties to the principal with impunity. That is not the law and we therefore reject Defendants' challenge based on the imputed knowledge doctrine.

5.     The Agreement Required Defendants to Repair the Properties and the Trial Court Properly Awarded Compensation for the Damage Caused by Defendants' Failure to Perform Repairs

Defendants contend Scot's claims for repair and rehabilitation costs failed because not only did the Agreement not require Defendants to repair the properties, but it also prohibited Defendants from performing rehabilitation or restoration work. According to Defendants, section 3.D. of the Agreement granted Defendants the authority and power to repair the properties, but nothing in the Agreement required Defendants to do so. Moreover, Defendants contend section 6.B. of the Agreement expressly excluded rehabilitation and restoration work from the duties imposed on Defendants and therefore the trial court erred in awarding damages. Defendants again misinterpret the Agreement.

"'The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to

17

writing, the parties' intention is determined from the writing alone, if possible. [Citation.]'" (*Zalkind*, *supra*, 194 Cal.App.4th at p. 1022.) "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (§ 1638.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (§ 1641.) "When, as in this case, no extrinsic evidence is introduced, the appellate court independently construes the contract. [Citation.]" (*Zalkind*, at p. 1022.)

Section 3 of the Agreement defines the authority and powers Scot granted Defendants. The subsection addressing "Repair/Maintenance" provides, "Owner grants Broker the authority and power, at Owner's expense, to: [¶] . . . [¶] Make, cause to be made, and/or supervise repairs, improvements, alterations, and decorations to the Property; purchase and pay bills for services and supplies. Broker shall obtain prior approval of Owner on all expenditures over $200 for any one item. Prior approval shall not be required for monthly or recurring operating charges, or, if in Broker's opinion, emergency expenditures over the maximum are needed to protect the Property or other property(ies) from damage, prevent injury to persons, avoid suspension of necessary services, avoid penalties or fines, or suspension of services to tenants required by a lease or rental agreement or by law. Broker shall not advance Broker's own funds in connection with the Property or this Agreement."

Because this section states Broker is granted the authority and power to make repairs and maintain the properties without stating the Broker must or has the duty to do so, Defendants contend they had no obligation to perform any repairs and therefore cannot be liable for any ensuing damage. This argument ignores not only the purpose of the Agreement, but also its other terms.

18

Section 1 of the Agreement "appoints and grants Broker the exclusive right to rent, lease, operate, and manage the property (ies)"[5] and section 2 provides, "Broker accepts the appointment and grant, and agrees to: [¶] A. Use due diligence in the performance of this Agreement. [¶] B. Furnish the services of its organization for the rental, leasing, operating, and management of the Property." In addition to the authority and power to repair and maintain the properties, section 3 of the Agreement also granted Defendants the authority and power to "collect and give receipts for rent," "[p]ay expenses and costs for the Property from Owner's funds, . . . includ[ing] . . . property taxes . . . loan payments, and insurance premiums," "Deposit all receipts collected for Owner . . . in a financial institution . . . [and hold] [t]he funds . . . in a trust account separate from the Broker's personal accounts," and "[m]aintain reserves in Broker's trust account of $300."

Under Defendants' interpretation of the Agreement they could perform some or all of these tasks when and if they chose, but they had no obligation to do so. For example, Defendants could collect rent or not collect rent; they could make loan payments and pay property taxes on Scot's behalf or not; they could keep the money they collect for Scot in a separate account or they could commingle those funds with their own. In other words, every power the Agreement granted to Defendants was optional and therefore they could never breach the Agreement because they never had a duty to do anything under the Agreement. Nothing suggests the parties intended that absurd result, but that is precisely what Defendants' interpretation requires.

To the contrary, by agreeing to use due diligence in the performance of the Agreement and to furnish services for the rental, leasing, operating, and management of the properties, Defendants agreed and assumed the contractual duty to perform all of the

_____

[5] The Agreement provided the appointment was exclusive for the first six months and nonexclusive after that period.

powers identified in section 3, including the power to repair and maintain the properties. As the trial court found, Defendants therefore breached the Agreement by failing to repair and maintain the properties.

Section 6.B. of the Agreement also did not prohibit the trial court from awarding Scot compensation for the damage Rodriguez and Defendants caused through their approximately 10 years of mismanagement. That section provides, "This Property Management Agreement . . . does not include . . . fire or major damage restoration, [or] rehabilitation . . . . If Owner requests Broker to perform services not included in this Agreement, a fee shall be agreed upon before these services are performed." This provision's plain meaning simply excluded a wide variety of extraordinary services that a property manager does not provide on a regular basis. Nothing in this provision, however, exculpated Defendants from liability for damages they caused by failing to perform basic maintenance services.

Finally, Defendants contend the damages the trial court awarded for repairing the properties constituted an impermissible windfall for Scot because the Agreement required him to pay the cost of all repairs and the trial court's award allowed Scot to shift those costs to Defendants. Again, Defendants are mistaken. The trial court's statement of decision specifically limited the repair damages it awarded Scot to the work required to fix the damage caused by Rodriguez's failure to repair the properties. The trial court excluded costs for ordinary maintenance expenses not linked to Rodriguez's failure to repair and maintain the properties. Accordingly, the trial court awarded only those items of damage it found Rodriguez caused and it specifically excluded the costs Scot would have otherwise paid as part of the ordinary upkeep for the properties.

20

6. Comparative Fault Principles Did Not Require the Trial Court to Reduce Scot's Recovery

Defendants contend the trial court erred because it failed to reduce damages under the doctrine of comparative fault. In their opening brief, Defendants argued the Browns contributed to their own damages because they had "*actual* knowledge . . . regarding the management and condition of their properties" and did nothing to prevent Rodriguez's misconduct. (Original italics.) In their reply, Defendants change the basis for their comparative fault argument and assert "the Browns' failure to inspect their own properties, to verify the monthly and annual cash flow reports, and to take legitimate steps to protect themselves were at least a part of the cause of their damages." Defendants' comparative fault challenge fails for three reasons.

First, their opening brief fails to provide any record citations to support their contention that the Browns had actual (or any other kind of) knowledge regarding the management and condition of the property. We therefore treat this argument as waived. (*Lonely Maiden*, *supra*, 201 Cal.App.4th at p. 384; *Guthrey*, *supra*, 63 Cal.App.4th at p. 1115.)

Second, Defendants' reply brief fails to provide any authority to support their implied premise that the Browns had a duty to inspect their properties and verify Rodriguez's cash flow reports despite hiring Defendants as their fiduciary for that specific purpose. We treat this argument as waived because Defendants asserted it for the first time in their reply brief and they failed to provide any authority to support it. (See, e.g., *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1292, fn. 6 ["[a]rguments presented for the first time in an appellant's reply brief are considered waived"]; *Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074 [appellant forfeited challenge by failing to present reasoned argument and explanation].) Moreover, as explained above, the fiduciary nature of the relationship

21

between Scot and Defendants excused Scot from any duty to inquire until the relationship ended. (*Lee*, *supra*, 210 Cal.App.3d at p. 921.)

Third, any error in the trial court's failure to expressly address whether the comparative fault doctrine required the court to reduce the Scots' damages was harmless. The court found Defendants liable for breach of contract, breach of fiduciary duty, and negligent supervision, and awarded Scot the same damages on all claims. Comparative fault applies to reduce a plaintiff's damages on tort claims only; it does not apply to contract claims. (*Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 406-407; *Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 42 ["we are persuaded that comparative negligence is not a defense to a breach of express warranty action"].)

### 7. The Trial Court Properly Credited Defendants for Rodriguez's Payment to Scot

Defendants contend the trial court erred by failing to reduce the damages it awarded Scot by the $11,800 payment Rodriguez made to Scot in June 2009. Defendants are incorrect. The testimony and damages spreadsheet by Scot's trial expert specifically acknowledged this payment and reduced the amount of damages to account for it. The trial court adopted the expert's damages calculation on this point.

## B. *Scot's Cross-Appeal*

### 1. The Trial Court Did Not Err in Awarding Scot Only a Portion of the Damages He Sought for Repairing the Properties

Scot sought nearly $295,000 to repair the damage to his properties he contends Rodriguez caused by failing to perform ordinary repairs and maintenance during his 10 years as property manager. In Scot's view, these extraordinary repairs would not have been necessary if Rodriguez had properly maintained the properties. The trial court agreed Rodriguez's failure to repair and maintain the properties required Scot to perform extraordinary repairs that would not have otherwise been required, but the

22

court only awarded Scot approximately $93,000 for those repairs because it found he failed to establish the cost for other repairs were linked to Rodriguez's neglect.

Scot contends the uncontroverted evidence showed all of these renovations were extraordinary repairs that would not have been necessary but for Rodriguez's failure to maintain the property. Scot points to the testimony of his current property manager, Kenneth Beaulieu, who supervised all of the repairs. Beaulieu testified he prepared two spreadsheets summarizing the cost for each repair at each property and how he categorized each item as either "Repairs/Replacements/Expenses" required because of Rodriguez's neglect or "Normal Maintenance." Because Defendants failed to present any evidence to rebut Beaulieu's testimony, Scot contends the trial court erred in failing to award him the full amount. We disagree.

Scot fails to account for the trial court's role as the fact finder in a bench trial and our limited role in reviewing the trial court's factual findings. Indeed, Scot's argument assumes the trial court was required to accept Beaulieu's testimony because it was "uncontroverted." But "the general rule [is] that 'expert testimony, like any other, may be rejected by the trier of fact, so long as the rejection is not arbitrary.' [Citation.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 632; *Conservatorship of McKeown* (1994) 25 Cal.App.4th 502, 509.) Indeed, "'"[p]rovided the trier of fact does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted. [Citations.]" [Citation.] This rule is applied equally to expert witnesses.' [Citation.]" (*Ibid.*, original italics.) Moreover, "where uncontradicted testimony has been rejected by the trial court, it 'cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved.' [Citation.]" (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717.)

Here, the trial court awarded Scot more than $51,000 for the Huntington Beach property to cover the cost of "Mold restoration abatement," "Tenant housing due to mold," and "Balcony replacement/Decks/stairwell decks." It awarded Scot $41,000

23

for the Costa Mesa property to cover the cost to "replace front wall, mold and Rot, Stucco and all fascia," "Stairwells," "Plans/permits (re stairwells)," "Balcony Railing," "Balcony Replacement," and "Mold abatement." The court found Scot "met [his] burden of proving [these] items were causally connected to the defendant's failure to keep the property in good repair."

In denying Scot's other repair costs, the trial court found, "While some of the items listed are related to the failure to keep the properties in good repair, others are either not clearly related or represent repairs that were simply deferred. That is, repairs that the Browns would have had to pay for anyway in order to maintain their properties. For example, the first item on Exhibit 168 'Evictions—Attorney/court . . . [$]1808.00' was not clearly related to [Defendants] keeping the premises in good repair. The eviction of a tenant most likely occurred when rent was not paid, an item that would have been deducted as an expense anyway. Similarly, 'Garage door replacement . . . $3560' may have been incurred even if the buildings had been properly maintained. . . . [¶] . . . [¶] There may have been some items (such as 'Labor A, B, C, D . . . $17,576' or 'Interior painting') that were at least partially related to work done as a result of defendant's failure to keep the property in good repair. However, plaintiff failed his burden of proving what portion of those expenses, if any, might have been related to the failure to maintain the property."

We may not second guess the trial court's conclusion that Scot failed to link all of the repair costs to the lack of proper maintenance because Scot has not met his burden to show Beaulieu's testimony was "'clear, positive, and of such a nature that it cannot rationally be disbelieved.' [Citation.]" (*Adoption of Arthur M.*, *supra*, 149 Cal.App.4th at p. 717.) To the contrary, Scot concedes that at least some items Beaulieu included in his "Repairs/Replacements/Expenses" category were not extraordinary repairs and should not have been included in that category. For example, Scot concedes the eviction costs sought for both properties should not have been included

24

in the damages he sought for extraordinary repairs.  Moreover, other items Beaulieu included appear to reflect ordinary repairs or maintenance, such as "Furnace Replacement" and "Water Heater Replacement," and Scot points to nothing in the record that required the trial court to believe the testimony that these items were required because of Rodriguez's failure to properly maintain the property.  Accordingly, we affirm the trial court's decision on the amount of damages Scot suffered based on Rodriguez's failure to repair and maintain the properties.

2.    The Trial Court Erred in Failing to Award Scot Damages for "Missing Rent Never Deposited"

Scot sought to recover damages for two categories of rent he claimed Rodriguez failed to collect and deposit in the trust account for the Browns' properties: (1) $93,894 for "[m]issing rent," which covers tenant rent payments Rodriguez claimed he collected, but either did not receive or received and failed to deposit in the trust account; and (2) $25,173 for "[m]issing rent never deposited," which covers tenant rent checks Rodriguez collected but later were returned for insufficient funds and Rodriguez never bothered to initiate collection procedures.  The trial court awarded Scot the full amount he sought for the first category, but nothing for the second category.

Scot contends the trial court's failure to award him the full amount for the missing rent was error for two reasons.  First, his expert's testimony clearly established this missing rent as an element of damages caused by Rodriguez's mismanagement of the properties.  Second, not only did the statement of decision fail to explain why the trial court refused to award Scot this missing rent, but the statement also failed to even acknowledge Scot sought this rent as an element of damages.  Although Scot waived any defect in the statement of decision by failing to object to the statement in the trial court, we nonetheless conclude the trial court erred because the record lacks substantial evidence to support the implied finding Scot failed to establish he was entitled to recover the amount he sought for missing rent never deposited.

25

In a nonjury trial, a party may request the trial court issue a statement of decision explaining the factual and legal basis for the court's decision. (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 896.) Any request must identify the particular controverted issues on which the requesting party seeks a statement of decision. (Code Civ. Proc., § 632.) If a statement of decision fails to decide one of those issues or is ambiguous, a party must object to the omission or ambiguity in the trial court or "waive[] the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134 (*Arceneaux*).) Specifically, "If an omission is not brought to the trial court's attention . . . the reviewing court will resolve the omission by inferring findings in favor of the prevailing party on that issue. [Citations.] If an ambiguity is not brought to the trial court's attention . . . the reviewing court will resolve the ambiguity by inferring that the trial court decided in favor of the prevailing party on that issue. [Citation.]" (*Uzyel*, at p. 896.)

"In order to avoid the application of this doctrine of implied findings, an appellant must take two steps. First, the appellant must request a statement of decision pursuant to Code of Civil Procedure section 632 . . . ; second, if the trial court issues a statement of decision, 'a party claiming omissions or ambiguities in the factual findings must bring the omissions or ambiguities to the trial court's attention' pursuant to [Code of Civil Procedure] section 634.' [Citation.]" (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 494.) Merely requesting a statement of decision on a particular issue after the trial court issued its tentative decision is not sufficient. (*Arceneaux*, *supra*, 51 Cal.3d at p. 1134.) "[A]ny defects in the trial court's statement of decision must be brought to the court's attention through specific objections to the statement itself." (*Bay World Trading, Ltd. v. Nebraska Beef, Inc.* (2002) 101 Cal.App.4th 135, 140.)

Here, the trial court issued its tentative decision and Scot responded by requesting a statement of decision. One of the issues Scot asked the court to address was

26

Defendants' liability for the missing rent never deposited. When the trial court later issued its statement of decision, it neither awarded Scot any damages for missing rent never deposited nor provided any explanation for refusing to do so. Indeed, the trial court's statement of decision is completely silent as to Scot's claim for this component of his damages. Scot, however, did not file any objections to the trial court's statement of decision or otherwise bring this omission to the court's attention.

Because he failed to object in the trial court, Scot waived any objection to the statement of decision's failure to address his claim for missing rent never deposited and we must presume the trial court found Scot failed to present sufficient evidence to establish his right to recover these damages. (*Arceneaux*, *supra*, 51 Cal.3d at pp. 1133-1134.) But that is not the end of our inquiry because we still must examine the record to determine whether it contains substantial evidence to support that implied finding. (*Fladeboe*, *supra*, 150 Cal.App.4th at pp. 48, 60.) Indeed, even though Scot waived any objection to the statement of decision itself, he did not waive any challenge to the sufficiency of the evidence supporting the trial court's decision. (See *Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17 [whether a finding is supported by substantial evidence is an issue of law that is never waived or forfeited on appeal]; *In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1560-1561 [same].)

We conclude there is no substantial evidence to support the trial court's implied finding that Scot failed to present sufficient evidence to establish his right to recover the damages he sought for missing rent never deposited. Defendants cite no evidence to support this implied finding and our review of the record likewise revealed no evidence to support this implied finding. Rather tellingly, Defendants' brief does not even address Scot's claim for missing rent never deposited.

In contrast, Scot's brief summarizes the testimony of Christopher Money, a certified public accountant and fraud examiner, who testified regarding the damages Scot suffered due to Rodriguez's failure to collect all of the rent from the tenants. Money

27

testified he examined the bank statements for the trust account into which Rodriguez deposited the rent payments, the cancelled rent checks from the tenants, and the cash flow reports Rodriguez prepared to summarize the rent he collected. From those records, Money determined there was $93,894 in rent Rodriguez failed to collect from the tenants and deposit in the trust account. Money's analysis further revealed an additional $25,173 in rent checks that Rodriguez collected and deposited in the trust account, but were not included in the first category because those checks were later returned for insufficient funds and Rodriguez never followed up to collect a valid payment. Money testified the full amount of the missing rent is the sum of these two categories. Defendants cross-examined Money regarding the first category of missing rent, but failed to ask Money any questions regarding the second category. Defendants also did not present any evidence to refute Money's testimony on the amount of missing rent.

Accordingly, not only is there no substantial evidence in the record to support the trial court's failure to award Scot damages for missing rent never deposited, there is no evidence to question the veracity of the evidence Scot presented to establish this element of his damages. We therefore reverse the trial court's judgment denying Scot damages for missing rent never deposited and remand for the trial court to issue a new statement of decision and enter judgment for Scot on those damages. (See *State Bar of California v. Statile* (2008) 168 Cal.App.4th 650, 672-673.)

3. Scot May Not Recover His Attorney Fees Under the Agreement's Fee Provision Because He Failed to Mediate Before Filing This Action

After trial, Scot filed a motion seeking his attorney fees under the Agreement's attorney fee provision. The provision authorized the prevailing party in any litigation seeking compensation under the Agreement to recover his or her attorney fees "except as provided in paragraph 9A." Paragraph 9A requires the parties to attempt to resolve any dispute through mediation before "resorting to . . . court action." That paragraph further provides, "If any party commences an action based on a dispute or

28

claim to which this paragraph applies, without first attempting to resolve the matter through mediation, then that party shall not be entitled to recover attorney's fees, even if they would otherwise be available to that party in any such action." The trial court denied Scot's motion because he failed to mediate his dispute before filing this action.[6]

Scot contends the trial court erred in denying his fee motion on this ground for three reasons, but each of them lacks merit. First, Scot contends Defendants are estopped from asserting the Agreement's mediation requirement because they concealed it from him. According to Scot, Defendants were his fiduciaries with the duty to disclose all information relevant to their management of the property, including the Agreement's attorney fee provision and the mediation requirement. Because Defendants did not specifically disclose the mediation requirement to him, Scot contends Defendants may not rely on it to prevent him from recovering his attorney fees. We reject this contention.

As the trial court found, Defendants were Scot's fiduciaries regarding the management of the properties, but that fiduciary relationship ended no later than June 2009 when Rodriguez admitted his malfeasance, Scot fired him, and Scot hired a new property manager. Any duty of disclosure Defendants owed ended when the fiduciary relationship ended. (*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 887 ["an agent's duty of disclosure *ordinarily* ends upon termination of the agency relationship" (original italics)]; *Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 861.) At that point in time, the relationship became

---

[6] In its entirety, the attorney fee provision states, "In any action, proceeding, or arbitration between Owner and Broker *regarding the obligation to pay compensation under this Agreement*, the prevailing Owner or Broker shall be entitled to reasonable attorney's fees and costs, except as provided in paragraph 9A." (Italics added.) Neither side addresses whether this is an action "regarding the obligation to pay compensation under this Agreement" which could justify a fee award if the mediation requirement had been satisfied. We do not address this issue because we agree the mediation requirement was not satisfied.

adversarial as Scot sought to recover his losses and Scot therefore had a duty to investigate his claims against Defendants. In recognition of that fact, Scot hired an attorney who filed this lawsuit, including its claim for breach of the Agreement, approximately one year after the fiduciary relationship ended. At trial, Scot testified he initialed the Agreement in 1999 and had a copy of it in his files from that point forward. He also testified he reviewed all of his files and provided them to his attorney when this dispute arose. Interestingly, Scot does not point to any evidence in the record showing he was unaware of the Agreement's mediation requirement. To claim the benefits of the Agreement, Scot also must bear its burdens and we see no grounds to estop Defendants from asserting the mediation requirement.

Second, Scot contends the mediation requirement does not apply because that requirement expressly excludes "[a]ny matter which is within the jurisdiction of a probate, small claims, or bankruptcy court." According to Scot, this action was within the jurisdiction of the probate court because the trial court required him to petition the probate court to appoint a personal representative for Cheryl and her estate that could be joined in this action. The court did so to ensure all possible parties were named as parties in this action. Nonetheless, this action was filed, tried, and at all times remained pending in the civil division of the Orange County Superior Court. Scot's petition in the probate division for appointment of a personal representative did not bring this separate civil action within the jurisdiction of the probate division and Scot cites no authority to support his suggestion that it did.

Finally, Scot contends he complied with the mediation requirement because he sent Defendants a letter in August 2009 asking for an accounting and all supporting documents relating to Defendants' management of the properties. Because the Agreement does not define the terms mediation or mediate, Scot contends this letter should be treated as a request to informally resolve this dispute and he therefore satisfied the mediation requirement. We disagree. Even in their ordinary and common use, the

30

terms mediation and mediate involve a process where a third party acts as an intermediary between two parties to help resolve a dispute. (See, e.g., Dictionary.com at <http://dictionary.reference.com/browse/mediate> (as of Nov. 15, 2013).) Scot's letter was simply a request for information; it did not request or even hint at involving a third party to resolve a dispute.

We therefore conclude the trial court properly denied Scot's fee motion. (See *Frei v. Davey* (2004) 124 Cal.App.4th 1506, 1508 [enforcing condition precedent in contractual attorney fee provision denying prevailing party right to recover fees if he or she does not attempt to mediate dispute before filing lawsuit].)

III

DISPOSITION

The judgment is reversed to the extent it denies Scot damages for missing rent never deposited and affirmed in all other respects. The postjudgment order denying Scot's attorney fee motion is affirmed. We remand for the trial court to issue a new statement of decision and enter a new judgment awarding Scot damages for missing rent never deposited. Scot shall recover his costs on appeal.

ARONSON, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

BEDSWORTH, J.

31