Filed 3/30/26  Rubin v. Douglas Elliman of Cal. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STANFORD K. RUBIN et al.,<br><br>      Plaintiffs and Appellants,<br><br>      v.<br><br>DOUGLAS ELLIMAN OF CALIFORNIA, INC.,<br><br>      Defendant and Respondent. | B341122<br><br>(Los Angeles County<br>Super. Ct. No. 22SMCV00454) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark H. Epstein, Judge.  Affirmed.

Sklar Kirsh, Jerry L. Kay and Loren N. Cohen for Plaintiffs and Appellants.

Manning & Kass Ellrod, Ramirez, Trester, Ari L. Markow and Mark R. Wilson for Defendant and Respondent.

_____

This is an appeal from the sustaining of a demurrer and grant of summary judgment in favor of Douglas Elliman of California, Inc. (Elliman). These rulings involve claims of fraudulent overbilling in the construction of a house developed by Scott Alan Moore, who also had the listing for plaintiffs'/appellants' purchase and ultimate sale of the property when he worked at Elliman and its predecessor.

We conclude plaintiffs fail to demonstrate a viable cause of action against Elliman based on Moore's alleged malfeasance. We also conclude the trial court did not abuse its discretion in denying plaintiffs' motion to amend their operative complaint to add new causes of action made after the court granted summary judgment. We thus affirm the judgment in favor of Elliman.

## PROCEDURAL BACKGROUND

In March 2022, plaintiffs Stanford K. Rubin, Adrienne S. Rubin individually and as co-trustees of the Stanford and Adrienne Rubin Family Trust (collectively plaintiffs) sued Scott Moore, Moore's construction company, So Cal Custom Construction & Design, Inc. (SCCCD), and Elliman. The second amended complaint — the operative pleading — alleges causes of action for breach of contract, fraud, elder abuse, negligent supervision, and breach of fiduciary duty.[1] Plaintiffs describe Elliman as "a licensed real estate broker" and "successor in interest to [Teles] Properties."[2]

---

[1] Moore and SCCCD cross-complained; the cross-complaint is not included in the record.

[2] On appeal, plaintiffs do not distinguish between Teles and Elliman in making their arguments.

In their second amended complaint, plaintiffs alleged SCCCD and Moore "diverted funds, committed violations of the Business and Professions Code intended to protect consumers, and misrepresented facts to the Plaintiffs to induce them to enter into . . . construction contracts . . . ." Plaintiffs alleged Moore "fraudulently" billed them "for work" he claimed to have completed, and provided "forged and fraudulently obtained receipts and invoices, billing the Plaintiffs for hundreds of thousands of dollars of work which was never provided to the Property, lining the pockets of MOORE and SCCCD, to the detriment of Plaintiffs." According to plaintiffs, "[b]ecause of the actions of Scott Moore and SCCCD, Plaintiffs have been damaged by more than $4 million." Plaintiffs claim Elliman is liable for Moore's torts because Moore was under Elliman's supervision and control and Elliman failed to oversee Moore's and SCCCD's work.

The trial court sustained Elliman's demurrer to the breach of fiduciary duty cause of action. Later, the trial court summarily adjudicated the causes of action against Elliman for fraud and negligent supervision.[3] Plaintiffs challenge these rulings on appeal.

After the trial court issued an order granting summary judgment in favor of Elliman, plaintiffs sought leave to amend their second amended complaint to delete previously alleged claims against Elliman and substitute causes of action for joint

---

[3] The trial court also summarily adjudicated in Elliman's favor the breach of contract cause of action because Elliman did not sign any of the construction contracts. On appeal, plaintiffs do not challenge summary adjudication of this cause of action.

3

venture.  The court denied that request because it was untimely and plaintiffs could not state a viable cause of action based on joint venture.

## FACTUAL BACKGROUND

### 1. *The parties and Scott Moore*

In 2014, plaintiffs bought property located in Pacific Palisades (the Property), which was sold on December 13, 2021. Plaintiffs purchased the Property for $3.505 million, paid $11,161,942.86 in construction costs, and sold the Property for $18,999,999.  Plaintiffs engaged in these transactions after meeting Scott Moore, a licensed real estate broker, licensed attorney, and licensed general contractor.  Moore is the sole officer, director, and shareholder of SCCCD, and the sole officer, director, and shareholder of BBS Development, Inc.  Moore coined a marketing strategy called BBS, which stands for Buy, Build, Sell.  Prior to working for Elliman, Moore worked as an associate-licensee for Teles Properties.

In 2014, when Moore started working at Teles, he sent an e-mail describing the "synergy" between Teles and Moore's Buy, Build, Sell strategy.  In that e-mail, he stated:  "I just wanted to say that it was the absolutely right decision to become part of the Teles Family and that the first month has been very enjoyable and I see a bright future ahead.  [¶] . . . [¶]  In order for me to lay the proper foundation for a marketing blast of this new relationship the most critical element as previously discussed is the synergy between Teles and BBS Development."

In 2017, Elliman purchased Teles.  In 2018, Moore began working for Elliman as an associate-licensee.  The agreement between Elliman and Moore describes Moore as an independent

4

contractor. Under the terms of Moore's and Elliman's agreement, Moore, as an associate-licensee, was required to "work diligently and with his/her best efforts to: (i) sell, exchange, lease, or rent properties listed with Broker or other cooperating Brokers; (ii) solicit additional listings, clients, and customers; and (iii) otherwise promote the business of serving the public in real estate transactions to the end that Broker and Associate-Licensee may derive the greatest benefit possible, in accordance with the law." The Moore/Elliman agreement prohibited Moore from engaging in the following services without Elliman's express written consent: property management, loan brokerage, and business brokerage. The agreement provided, "Associate-Licensee shall receive a share of compensation actually collected by Broker, on listings or other agreements for services requiring a real estate license, which are solicited and obtained by Associate-Licensee, and on transactions of which Associate-Licensee's activities are the procuring cause . . . ."

## 2. *Plaintiffs' agreements with Moore and SCCCD*

Plaintiffs attached to their second amended complaint construction documents between them and SCCCD and residential listing agreements between them and Moore and Klein. On June 24, 2014, plaintiffs and SCCCD entered into a general contractor's agreement. Also in June 2014, plaintiffs entered into a residential listing agreement providing Scott Moore and Devin Klein an exclusive right to sell the Property.[4] Neither Teles nor Elliman was a party to the 2014 listing agreement.

---

[4] In a declaration, Moore identified Klein as a former business partner.

5

In November 2015, plaintiffs and SCCCD amended their "standard form of agreement between owner and contractor dated June 24, 2014." (Boldface & capitalization omitted.) The amendment, which increased the scope of construction, was executed by Adrienne Rubin as trustee of the Stanford and Adrienne Rubin Family Trust. It was signed on behalf of SCCCD by Scott Moore and Devin Klein. On October 20, 2015, plaintiffs entered a new residential listing agreement providing Scott Moore and Devin Klein exclusive authorization to sell the property. Neither Teles nor Elliman was a party to the 2015 listing agreement.

### 3.     *Plaintiffs' listing agreement with Elliman*

Plaintiffs attached to their second amended complaint, two modifications to the 2015 residential listing agreement. Those modifications indicated that Elliman would serve as broker. A March 13, 2018 modification of the 2015 listing agreement identifies Elliman as broker. Another modification, dated January 1, 2019, provides: "Douglas Elliman ('Broker') shall be the Broker of record for this transaction." It further states: "Broker shall put together a first class marketing plan including an event at the Property including valet, automotive, art, spirits, catering, press, etc. at a cost/value between $10,000 to $20,000" and continues: "All other terms and conditions of the RLA dated 10/20/15 remain the same."

In an undated presentation, Moore and Elliman made a written "listing presentation" to plaintiffs to obtain the right to sell the Property. Included in that "presentation" was a statement that Moore was "[b]acked" by Elliman. The "presentation" also stated plaintiffs' "[t]rust can offset one hundred percent (100%) of the agent[']s commission (2%) less

6

Douglas Elliman's brokerage fee (10%) against construction overages." As part of this presentation, the president of Douglas Elliman, Western Region wrote plaintiffs in support of Moore's "potential representation for the sale" of the Property.

### 4. *Moore's declaration and deposition testimony*[5]

In a declaration in support of Elliman's motion for summary judgment, Moore averred that in May 2018, he entered into an independent contractor agreement with Elliman where he became an associate-licensee to Elliman "for purposes of acting solely as a real estate broker and engaging in only those activities that require a real estate broker license." Moore also averred that in 2014, he and Tony Ramsey started BBS Real Estate (BBSRE), "which was nothing more than a marketing model that solely belongs to Mr. Ramsey and me." Moore continued: "The 'BBS' stands for Buy, Build, Sell. [Teles] and [Elliman] . . . did not participate in the creation and origination of BBSRE." Moore further declared Elliman and Teles never had any ownership interest in, or any right to control the operations at SCCCD, BBS Development, Inc. (BBSI), or BBSRE.

Moore also stated Elliman and Teles never received any financial benefit from SCCCD or Moore in connection with SCCCD's construction contracts with plaintiffs. Moore represented he always was the sole officer, director, and shareholder of SCCCD. Moore further represented that his construction business and construction activities were "always

---

[5] The trial court overruled plaintiffs' objections to Moore's declaration. Plaintiffs have forfeited any challenge to the trial court's ruling by failing to renew their objections on appeal. (*A.B. v. County of San Diego* (2025) 112 Cal.App.5th 404, 420, fn. 5.)

independent of and never part of" his associate-license with Teles or Elliman. Teles and Elliman never participated in Moore's construction business. Moore stated Elliman and Teles were not parties or third party beneficiaries to the construction contracts with plaintiffs.

In a deposition, Moore testified Teles provided office space for persons helping him with SCCCD. Moore also met with plaintiffs' son at Moore's office at Teles. According to Moore, Teles knew he was operating SCCCD and Teles knew about his Buy, Build, Sell marketing strategy. A flyer dated August 4, 2016 describes BBS: "BBS, helmed by CEO Scott Moore, is a full service residential firm in association with Teles Properties based in Brentwood that works with clients to buy, build, and sell their homes in West Los Angeles." That flyer advertised an event at Moore's house at which one or both plaintiffs attended. With respect to Teles, the flyer stated: "Part one of the event, from 2-4pm, is a presentation by CEO of Teles Properties . . . on listing strategies in the current market. This portion is for agents only."

Moore testified SCCCD was the "construction arm of BBS Development," and Teles Properties and then Elliman were the "brokerage arm." In his deposition, Moore stated he used Elliman's mailing address for SCCCD and BBSI. Moore's SCCCD project manager worked at the Elliman office. While using an office at Elliman, the project manager organized paperwork related to the construction of the Property and created a spreadsheet showing what had been completed. SCCCD's vendors would pick up checks from Moore at the Elliman office. Moore also met with an SCCCD accountant at Elliman's office.

At his deposition, Moore admitted $400,000 paid by plaintiffs "didn't go into the project."

8

### 5. *Adrienne Rubin's declaration*

In her declaration in opposition to summary judgment, Adrienne Rubin stated she met Moore in his office at Teles at a time she did not identify. At that meeting, he described the Buy Build, Sell program to her. Moore told her that "we would buy the real property through his brokerage, Teles Properties, . . . and that Mr. Moore, who was a licensed contractor owning So Cal Construction & Design, Inc. ('SCCCD') would improve the property, and then Mr. Moore and Teles would list the property for sale at a profit." Adrienne Rubin stated that she "entered into the transaction with Scott Moore and Teles Properties in the spring of 2014 *solely* because of his Buy, Build, Sell Program and the fact he was a contractor. . . . The primary reason I engaged Scott Moore as a contractor for this project was that he convinced me that he was with Teles and that Teles had a strong presence as a brokerage firm both domestically and internationally." Adrienne Rubin met Moore several times at the Elliman office to discuss the construction.

Adrienne Rubin attended a marketing event in 2016 at Moore's residence. The president of Elliman also was there and Adrienne Rubin was "delighted to see" the Property described as "Coming Soon."

Adrienne Rubin relied on Moore's advice to expand the scope of the construction to "increase the sale price of the home and make a bigger profit. When the budget increased, the selling price increased." When Moore modified the construction documents, he also modified the residential listing agreement. Adrienne Rubin "viewed the entire transaction as a package of contracts . . . ."

9

Adrienne Rubin represented that the 2019 modification of the listing agreement adding Elliman as the broker occurred after "Moore wanted to preserve the relationship. The construction had been delayed and costs had gone over our budget. Mr. Moore was making a concerted effort to get a renewal of the listing, which was going to expire." Moore and Elliman presented her a marketing presentation in an effort to ensure plaintiffs would list the Property for sale with Elliman. Adrienne Rubin stated Elliman knew Moore was both the contractor and real estate agent and "bundled his services under his BBS Program."

She also averred, "Because of the actions of Scott Moore and SCCCD, we have been damaged by more than $4 million." She stated Moore printed fraudulent invoices while he was in his office at Elliman.

## DISCUSSION

### A. Standards of Review

#### 1. *Demurrer*

"Because the function of a demurrer is to test the sufficiency of a pleading as a matter of law, we apply the de novo standard of review in an appeal following the sustaining of a demurrer without leave to amend. [Citation.] We assume the truth of the allegations in the complaint, but do not assume the truth of contentions, deductions, or conclusions of law. [Citation.] It is error for the trial court to sustain a demurrer if the plaintiff has stated a cause of action under any possible legal theory, and it is an abuse of discretion for the court to sustain a demurrer without leave to amend if the plaintiff has shown there is a

10

reasonable possibility a defect can be cured by amendment." (*California Logistics, Inc. v. State of California* (2008) 161 Cal.App.4th 242, 247.) " '[W]here the allegations in the body of the complaint are contrary to documents incorporated by reference in it, we treat the documents as controlling over their characterization in the pleading.' [Citation.]" (*Executive Landscape Corp. v. San Vicente Country Villas IV Assn.* (1983) 145 Cal.App.3d 496, 499.)

In deciding whether a demurrer was properly sustained, " '[w]e are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale.' [Citation.]" (*Center for Environmental Health v. Perrigo Co.* (2023) 89 Cal.App.5th 1, 16.) A trial court does not abuse its discretion in sustaining a demurrer without leave to amend when there is no reasonable possibility the defect can be cured by amendment. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) Plaintiffs have the burden to show that they could state a cause of action if allowed the opportunity to replead. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 890.)

### 2. *Summary judgment*

The standards for reviewing summary judgments are well established. "Summary judgment is appropriate only if there is no triable issue of material fact and the moving party is entitled to judgment in its favor as a matter of law. [Citation.] . . . A defendant moving for summary judgment . . . must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense. [Citation.] The defendant can satisfy its burden by presenting evidence that negates an element of the cause of action or evidence that the plaintiff does not possess and cannot reasonably expect to obtain

11

evidence needed to support an element of the cause of action. [Citation.] If the defendant meets this burden, the burden shifts to the plaintiff to set forth 'specific facts' showing that a triable issue of material fact exists. [Citation.] [¶] We review the trial court's ruling de novo . . . . [Citation.] We will affirm an order granting summary judgment . . . if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons." (*Securitas Security Services USA, Inc. v. Superior Court* (2011) 197 Cal.App.4th 115, 119–120.)

Although we independently consider whether summary judgment was properly granted, " ' "it is the appellant's responsibility to affirmatively demonstrate error," ' and 'review is limited to issues adequately raised and supported in the appellant's brief.' [Citation.]" (*Vasquez v. Department of Pesticide Regulation* (2021) 68 Cal.App.5th 672, 685; see also *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 708 [burden is on appellant to establish error, even on de novo review].) De novo review does not require the appellate court to cull the record; "[i]t is the duty of a party to support the arguments in its briefs by appropriate reference to the record . . . ." (*Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205.)

## B. The Trial Court Properly Sustained Elliman's Demurrer to the Breach of Fiduciary Duty Cause of Action

### 1. *Additional background*

In their breach of fiduciary duty cause of action, plaintiffs allege Elliman "should have been overseeing" Moore and SCCCD.

Plaintiffs further allege Moore operated SCCCD out of his office at Elliman.  Plaintiffs state Elliman had a fiduciary relationship to its clients and "owed a fiduciary duty to Plaintiffs to supervise all aspects of the" BBS program.  Plaintiffs also claim Elliman had a "duty to assure that MOORE and SCCCD properly hire[d] competent" personnel.

On appeal, plaintiffs seek leave to amend their second amended complaint to add the following allegations to their breach of fiduciary duty cause of action:

1.  The October 20, 2015 listing agreement between plaintiffs and Moore and Klein reduced the agent's listing commission because of increased cost in the construction project.  The listing agreement stated that this "serve[s] to provide Seller with an additional tool to compel Broker to provide proceeds from its commission to satisfy all or a portion of any outstanding Contractor liabilities related to Construction in the event Contractor has not fulfilled its financial obligations prior to the commencement of escrow."  Moore, Klein, and Adrienne Rubin signed the listing agreement.

2.  Moore's e-mail signature block included references to both BBSRE and Douglas Elliman Real Estate.  Further, "[e]mails with these signature blocks were used for construction related communications."  This signature continued even though the "Vice President of Compliance[ ] at Teles Properties flagged the signature blocks to be in violation of Department of Real Estate regulation for combining BBS Real Estate with Teles Properties."

3.  BBS's website stated, "We Buy, Build, and Sell your home.  Within our team, you get the respected broker with

13

exclusive listings and the builder with 15 years of development experience."

The trial court sustained Elliman's demurrer to the breach of fiduciary duty cause of action because as a broker, Elliman was not required to oversee the construction. "There is nothing in the contracts indicating that [Elliman] knowingly undertook or agreed to oversee the construction activities of Moore or at the property generally. Additionally, [Elliman] persuasively notes that such duties are not inherently part of the duties of a broker, nor is there any allegation that [Elliman] doubles as a general contractor." The court continued: "All of [the] alleged wrongdoing relates to work done under the various construction contracts; none of it goes to the listing contracts to which [Elliman] was a party." "Because the alleged breach of fiduciary duty is only based on the general contractor duties, there needs to exist a fiduciary duty to oversee general contractor-related things. The statutory broker duties simply do not extend that far." "Operation out of the same office cannot extend a fiduciary duty related to construction without more."

### 2. *Analysis*

On appeal, plaintiffs argue Elliman "owed the Rubins a 'duty to assure that Moore and SCCCD properly hired competent superintendents and subcontractors and assure that the billings that were provided to the Rubins were truthful, accurate, and after being provided, paid, to be sure that the superintendents placed on the project did not allow persons to steal materials from the jobsite, or to fraudulently bill for labor not incurred on the site.'" The argument is unpersuasive because Elliman's fiduciary duties did not involve construction of the Property. Instead, its duties were limited to the sale of the Property, for

14

which, as noted below, Elliman would be plaintiffs' fiduciary. Malfeasance in the sale of the Property, however, is not the basis of plaintiffs' claims.

"A fiduciary relationship is ' "any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party.  Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent. . . ." ' [Citations.]"  (*Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 29.)  "The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages."  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)  " '[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law.' [Citation.]"  (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 386 (*City of Hope*).)

A construction contractor is not a fiduciary.  (*California Taxpayers Action Network v. Taber Construction, Inc.* (2017) 12 Cal.App.5th 115, 138.)  Plaintiffs do not allege Moore or SCCCD breached a fiduciary duty.  The basis of plaintiffs' claim is the hiring of competent superintendents and subcontractors and assuring that invoices are accurate.  These activities relate to construction of the Property, not its sale.

15

In contrast, a real estate broker is a fiduciary to clients. (*Field v. Century 21 Klowden-Forness Realty* (1998) 63 Cal.App.4th 18, 25 [broker had fiduciary duty when representing client in purchase of residential property]; *Lazar v. Bishop* (2024) 107 Cal.App.5th 668, 681 [discussing broker's fiduciary duty in connection with sale of a house].) That duty does not extend to hiring superintendents and subcontractors or reviewing construction invoices, but instead, to conduct related to purchasing and selling property.[6] As plaintiffs acknowledge on

---

[6] The Business and Professions Code describes real estate broker: "A real estate broker . . . is a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others:

"(a) Sells or offers to sell, buys or offers to buy, solicits prospective sellers or buyers of, solicits or obtains listings of, or negotiates the purchase, sale, or exchange of real property or a business opportunity.

"(b) Leases or rents or offers to lease or rent, or places for rent, or solicits listings of places for rent, or solicits for prospective tenants, or negotiates the sale, purchase, or exchanges of leases on real property, or on a business opportunity, or collects rents from real property, or improvements thereon, or from business opportunities.

"(c) Assists or offers to assist in filing an application for the purchase or lease of, or in locating or entering upon, lands owned by the state or federal government.

"(d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or

16

appeal: "Elliman is a real estate brokerage licensed under California law to assist its clients, members of the public, *in real estate transactions*." (Italics added.) Assuming the truth of plaintiffs' allegations, including those described above in the additional background that plaintiffs seek to add for the first time on appeal, the broker-client fiduciary relationship does not include a fiduciary duty to oversee construction on the Property or SCCCD's hiring of personnel. No allegation — including those in the second amended complaint and those in plaintiffs' supplemental brief on appeal — supports the conclusion that Elliman knowingly undertook to act on behalf of plaintiffs for their benefit with respect to the construction. (*City of Hope*, *supra*, 43 Cal.4th at p. 386.)

Plaintiffs rely on *Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741 to argue the trial court erred in sustaining Elliman's demurrer to their breach of fiduciary duty claim. The issue in that appeal from the grant of summary judgment was whether defendant Coldwell Banker was liable for purported misrepresentations about a property by a real estate broker who "independently owned and operated a Coldwell Banker franchise." (*Id.* at p. 743.) The appellate court rejected liability for a franchisee's misrepresentations on a respondeat superior theory. It reasoned the franchisee held out

---

collaterally by liens on real property or on a business opportunity.

"(e) Sells or offers to sell, buys or offers to buy, or exchanges or offers to exchange a real property sales contract, or a promissory note secured directly or collaterally by a lien on real property or on a business opportunity, and performs services for the holders thereof." (Bus. & Prof. Code, § 10131.)

17

his real estate office as independently owned and operated, and the Coldwell Banker logo did not appear on any of the forms and transactional documents that franchisee used. Coldwell Banker, moreover, did not control or have the right to control the franchisee's business activities. The court, however, concluded the trial court erred in rejecting plaintiff's ostensible agency theory even though Coldwell Banker made "no specific representations" to appellant "personally." (*Id*. at p. 747.) The court reasoned: "We understand why appellant, and members of the public generally, might believe that Coldwell Banker 'stood behind' Marsh's realty company. The venerable name, Coldwell Banker, the advertising campaign, the logo, and the use of the word 'member' were and are designed to bring customers into Coldwell Banker franchises. As appellant stated at his deposition: Coldwell Banker's 'outreach was successful. I believed they [Marsh and Davidson] were Coldwell Banker. They do a good job of that.' " (*Ibid*.)

Here, in contrast to *Kaplan*, plaintiffs do not seek to hold Elliman liable for any misrepresentation in the context of a real estate transaction.

In their supplemental brief, plaintiffs cite to California Code of Regulations, title 10, section 2731. That regulation provides: "A licensee shall not use a fictitious name in the conduct of any activity for which a license is required under the Real Estate Law unless the licensee is the holder of a license bearing the fictitious name." (Cal.Code Regs., tit. 10, § 2731, subd. (a).) Plaintiffs fail to explain how this regulation supports a breach of fiduciary duty cause of action against Elliman for the alleged fraudulent construction invoices.

18

Finally, plaintiffs have not demonstrated they could amend the operative complaint to assert a cause of action for breach of fiduciary duty.[7]  Plaintiffs' theory is construction invoice fraud. They do not allege any malfeasance in connection with the sale of the Property.  Plaintiffs provide no legal authority supporting their theory that Elliman's fiduciary duties extended beyond selling the Property.

## C. The Trial Court Properly Summarily Adjudicated the Negligent Supervision Cause of Action

### 1. Additional background

According to plaintiffs, Elliman had knowledge of the BBS program and knew or should have known Moore operated SCCCD out of the Elliman office, and knew or should have known Moore marketed his construction services alongside his real estate services.  One or more plaintiffs attended meetings about the BBS program at Elliman's office.  Moore held himself out as a broker, contractor, and lawyer.  Elliman "chose to be an active participant in the [BBS] program and therefore was obligated to supervise and oversee its implementation."  Elliman stood to gain

_____

[7] Respondent argues this court should not consider unpleaded allegations and evidence attached to plaintiffs' supplemental brief.  We choose to address plaintiffs' arguments on the merits and conclude that even considering the proposed new allegations, plaintiffs cannot state a cause of action for breach of fiduciary duty.  Respondent also argues even if it had a fiduciary duty, that fiduciary duty was not breached.  We do not address that argument because plaintiffs fail to demonstrate Elliman owed it a fiduciary duty involving the construction of the Property.

an "enhanced commission" because of the BBS program. Plaintiffs allege that Elliman "entered into and agreed upon" the BBS Program.

The trial court ruled that a cause of action for negligent supervision requires a showing that the person in a supervisorial position had prior knowledge of the actor's propensity to do a bad act. The trial court found no evidence Elliman had knowledge Moore defrauded clients. The trial court also concluded, "[A]bsent some reason to believe that [Elliman] was negligent, there can be no cause of action for negligent supervision or any other form of negligence."

### 2. *Analysis*

On appeal, plaintiffs assert their negligent supervision cause of action "is closely tied" to the breach of fiduciary duty cause of action.[8] (Boldface, underscoring & capitalization omitted.) Plaintiffs argue that the "trial court gave too little weight to the undisputed facts that Elliman and Moore engaged in and marketed to the Rubins the Buy Build Sell program, especially where Elliman participated in marketing events directed to the Rubins, allowed for its operation under the roof of Elliman, had its listing contracts packaged with the construction contracts, and had no policies or procedures in place to safeguard the Buy Build Sell program from the Rubins and other consumers." Without citation to authority, plaintiffs assert,

---

[8] On appeal, plaintiffs incorporate their briefing regarding their breach of fiduciary duty claim into the discussion of their negligent supervision claim. To avoid duplication, we discuss their arguments regarding supervision in our analysis of their negligent supervision claim.

"Elliman was obligated under law to supervise the actions of Moore, especially in a unique program they created to solicit clients to engage in high valued real estate transactions."

Negligence, including negligent supervision, requires the existence of a legal duty. (*Mendoza v. City of Los Angeles* (1998) 66 Cal.App.4th 1333, 1339.) "Liability for negligent hiring and supervision is based upon the reasoning that if an enterprise hires individuals with characteristics which might pose a danger to customers or other employees, the enterprise should bear the loss caused by the wrongdoing of its incompetent or unfit employees. The tort has developed in California in factual settings where the plaintiff's injury occurred in the workplace, or the contact between the plaintiff and the employee was generated by the employment relationship." (*Mendoza*, *supra*, at pp. 1339–1340.)

Elliman had a duty to supervise Moore's conduct when he acted as an Elliman licensed associate. (*Horiike v. Coldwell Banker Residential Brokerage Co.* (2016) 1 Cal.5th 1024, 1036 ["Brokers . . . are required to supervise the activities of their salespersons and may be disciplined and held liable based on salespersons' conduct within the scope of their employment."].) California Code of Regulations, title 10, section 2725 requires a broker to supervise "the activities of their salespersons or broker associates acting in the capacity of a salesperson."[9] Plaintiffs'

---

[9] Business and Professions Code section 10177, subdivision (h), cited by plaintiffs, provides: "The commissioner may suspend or revoke the license of a real estate licensee, delay the renewal of a license of a real estate licensee, or deny the issuance of a license to an applicant, who has done any of the following, or may suspend or revoke the license of a corporation, delay the renewal

21

theory of liability, however, is not that Elliman negligently supervised Moore's activities in his capacity as Elliman's associate-licensee.

Moore's construction activities, including the alleged improper construction billing, are not within Moore's scope of work described in the Moore/Elliman employment agreement and plaintiffs cite no legal authority in support of a duty on Elliman's part as to Moore's construction activities. Plaintiffs concede they were aware that SCCCD, not Teles or Elliman, would be responsible for the construction. In her declaration, Adrienne Rubin admits Moore told her "we would buy the real property through his brokerage, Teles Properties . . . and that Mr. Moore, who was a licensed contractor owning . . . SCCCD . . . would improve the property, and then Mr. Moore and Teles [which was purchased by Elliman] would list the property for sale at a profit."

To the extent plaintiffs argue Elliman had a duty to tell plaintiffs it was not supervising construction, plaintiffs again cite no legal authority supporting such a contention. We decline to consider an argument unsupported by legal authority. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["When legal argument with citation to authority is not furnished on a

---

of a license of a corporation, or deny the issuance of a license to a corporation, if an officer, director, or person owning or controlling 10 percent or more of the corporation's stock has done any of the following." "As a broker licensee, failed to exercise reasonable supervision over the activities of that licensee's salespersons, or, as the officer designated by a corporate broker licensee, failed to exercise reasonable supervision and control of the activities of the corporation for which a real estate license is required."

22

particular point, we may treat the point as forfeited and pass it without consideration.].)

In short, plaintiffs offer no evidence supporting the first element of negligence — legal duty.  (*Peredia v. HR Mobile Services, Inc.* (2018) 25 Cal.App.5th 680, 687 [element of negligence includes duty].)  Without showing that Elliman had a legal duty to supervise the construction at the Property, plaintiffs cannot state a viable cause of action that Elliman was negligent in supervising the construction.  The trial court did not err in summarily adjudicating this cause of action.

## D.   The Trial Court Properly Summarily Adjudicated the Fraud Cause of Action

### 1.   *Additional background*

Plaintiffs allege they trusted Elliman "would be overseeing their broker in this transaction."  Plaintiffs further assert, "MOORE and SCCCD without the consent of the Plaintiffs, contracted with persons to overbill, to divert funds and divert materials away from the jobsite, causing the Plaintiffs to incur damages . . . ."  As to Elliman, they allege, "ELLIMAN, as broker, is liable for the tortious actions of its agent/broker MOORE performed under their supervision and control."

The trial court ruled for Elliman to be vicariously liable for Moore's fraud, "plaintiffs must establish at least a triable issue of fact that Moore was acting *in his capacity as a real estate agent* for [Elliman] when [he] committed the torts.  But he was not.  He was acting in his capacity as the contractor."

23

## 2. *Analysis*

On appeal, plaintiffs argue there are material issues of disputed fact as to whether the BBS program was within Moore's scope of employment with Elliman. Plaintiffs identify no evidence supporting that contention.

It was undisputed Moore created BBSRE in 2014 as "a marketing model that stands for Buy, Build, Sell." Elliman employed Moore in 2018 as an Associate-Licensee to engage in those activities requiring a real estate broker license. Plaintiffs appear to contend Elliman's knowledge of Buy, Build, Sell, or Elliman's allowing Moore to use Elliman's office space for construction related activities brought the construction activities within Moore's scope of employment at Elliman. Plaintiffs cite no cogent authority supporting that proposition.

Plaintiffs principally rely on *Alhino v. Starr* (1980) 112 Cal.App.3d 158, 175 (*Alhino*), but to no avail. There, Alhino owned two parcels of property and Robert Senjo acted as a real estate agent in connection with the properties' sale. (*Id.* at p. 165.) Senjo did not inform Alhino of loans the buyer needed for the downpayment. (*Ibid.*) Instead, Senjo misrepresented the buyer's wealth and encouraged Alhino to accept an unsecured promissory note without an attorney fee or acceleration clause for the remaining purchase price. The buyer defaulted on the promissory note. (*Id.* at pp. 165, 171–172.) Senjo knew some of his representations regarding the buyer's financial status were false. (*Id.* at p. 173.) The court found misrepresenting information about the buyer was a violation of the real estate agent's fiduciary duty and there was substantial evidence Senjo's employer ratified Senjo's conduct. (*Ibid.*) The court also held "under the doctrine of respondeat superior," Senjo's employer's

24

liability "extends to malicious acts and other intentional torts of an employee committed within the scope of his employment." (*Id.* at pp. 173, 174.) Quoting Witkin,[10] the court first noted courts do not always distinguish between respondeat superior and ostensible agency theories, and then wrote, " '[W]here the principal actually or apparently authorizes representations about a matter *related to the agent's duties*, and the agent has knowledge of their falsity, this knowledge may be imputed to the principal, even though the agent is acting adversely. [Citations.] [¶] 'If the principal places the agent in a position to defraud, and the third person relies upon his apparent authority to make the representations, the principal is liable even though the agent is acting for his own purposes. [Citation.] . . .' [Citation.]" (*Alhino*, at pp. 173–174, some italics omitted.)

Simply put, the fraud in *Alhino* occurred in connection with the sale of two real properties, and involved misrepresentations within the scope of the real estate agent's duties and with the knowledge of the real estate agent's employer.

That evidence is missing here. Moore's and his affiliated companies' invoice fraud occurred in the context of construction for which SCCCD was responsible, as reflected in the construction agreements and Moore's statement to Adrienne

---

**10** *Alhino* quotes the following passage from Witkin: " 'Liability may also be based on imputed knowledge. Thus, where the principal actually or apparently authorizes representations about a matter related to the agent's duties, and the agent has knowledge of their falsity, this knowledge may be imputed to the principal, even though the agent is acting adversely.' [Citations.]' [Citation.]" (*Alhino, supra,* 112 Cal.App.3d at p. 174.)

25

Rubin that SCCCD would be responsible for the construction. Further, at the risk of being repetitive, Moore's agreement with Elliman described his activities as selling, exchanging, leasing, or renting properties listed with broker and soliciting additional listings, clients, and customers. (See Factual Background, part 1, *ante*.) No reasonable interpretation of that agreement would include construction within the scope of Moore's duties as an associate-licensee for Elliman. In further contrast to *Alhino,* plaintiffs admitted in their interrogatory responses they have no evidence Elliman ratified Moore's fraudulent conduct.

**E.   Plaintiffs Do Not Show the Trial Court Abused its Discretion In Denying Them Leave To File a Third Amended Complaint Adding Joint Venture Causes of Action**

On appeal, plaintiffs argue the trial court abused its discretion in denying leave to amend the second amended complaint to add causes of action based on a joint venture theory.

In their proposed third amended complaint, plaintiffs deleted Elliman from their breach of contract, fraud, negligent supervision, and breach of fiduciary duty causes of action. Plaintiffs substituted causes of action for fraud, negligence, and breach of the covenant of good faith and fair dealing against Elliman "in joint venture with SCCCD and Moore." (Boldface & capitalization omitted.) Plaintiffs assert their "request for leave to amend was based on the same operative set of facts, but as applied to a joint venture theory of liability."

"We review the denial of a motion for leave to amend for abuse of discretion." (*Foroudi v. The Aerospace Corp.* (2020) 57 Cal.App.5th 992, 1000.) " ' " '[T]he discretion to be exercised is that of the trial court, not that of the reviewing court. Thus, even

26

if the reviewing court might have ruled otherwise in the first instance, the trial court's order will yet not be reversed unless, as a matter of law, it is not supported by the record.' " [Citations.]' [Citation.]" (*Board of Trustees v. Superior Court* (2007) 149 Cal.App.4th 1154, 1163.) Plaintiffs bear the burden of establishing an abuse of discretion. (*Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.* (2005) 130 Cal.App.4th 1078, 1097 (*Emerald Bay*).)

Central to its decision to deny plaintiffs' request to amend their complaint after the court had already ruled against them on summary judgment was plaintiffs' inadequate delay in seeking to amend. The court's reasoning bears reprinting here, particularly its recognition that the general principle of liberal leave to amend has limitations as applied to summary judgment motions: "The law is well settled that if a demurrer is sustained, leave to amend should be granted unless it is plain that no amendment can be made or plaintiff has had a number of chances to amend but has failed to do so in a way that cures the infirmity. . . . California policy suggests that leave ought to be granted liberally to cure mere pleading defects. Summary judgment is different. Summary judgment is a 'speaking' motion; it is based on evidence, not allegations. Parties have engaged in discovery that [has] been informed by the pleadings in the case in order to marshal the evidence needed to show that there is no triable issue of material fact (or that there is such an issue). New theories espoused after the motion can render the prior discovery ill-taken or inadequate, meaning that a second motion will need to be granted. That is not to say that a motion to amend can never be granted, but it is to say that the policies do not favor such an amendment to the same degree as a mere pleading

27

motion.  Similarly, the party opposing summary judgment has a full 61 days to oppose the motion, and more if taking discovery is required.  Having seen the motion and having had a full chance to analyze it, one would expect that if the pleadings need to be amended, it should be done before the court works up the motion and before the hearing.  Plaintiffs here did no such thing.  They waited until after the motion was granted to raise their entirely new theory of the case.  Their only explanation for this delay is that they did not think of the theory until they consulted with new counsel.  The court notes that an inordinate delay in bringing a motion to amend is grounds to deny it, even in the absence of prejudice, and the court finds the explanation here inadequate."

On appeal, plaintiffs offer no rationale for their delay in raising the joint venture theory.  Citing *Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1664 plaintiffs argue, as they did below, that requests to consider a previously unpleaded issue " 'are routinely granted and liberally granted.' "  Plaintiffs, however, did not make a request to amend until after the court ruled against them on Elliman's motion even though they concede their belated proposed amended complaint was not based on any facts they did not have earlier.  Indeed, they claim their new joint venture causes of action are based on the same facts as those in the operative pleading.

Plaintiffs cite no case holding that it is an abuse of discretion to deny leave to amend a complaint filed *after* an adverse order granting summary judgment.[11]  Contrary to

---

[11] The authority plaintiffs cite do not assist them.  For example, in *Melican v. Regents of University of California* (2007)

28

plaintiffs' argument, " ' "[t]he law is well settled that a long deferred presentation of the proposed amendment without a showing of excuse for the delay is itself a significant factor to uphold the trial court's denial of the amendment. [Citation.]" [Citation.] "The law is also clear that even if a good amendment is proposed in proper form, unwarranted delay in presenting it may — of itself — be a valid reason for denial." [Citation.]' [Citations.]" (*Emerald Bay, supra*, 130 Cal.App.4th at p. 1097;

151 Cal.App.4th 168, the plaintiffs sought leave to amend a breach of contract claim at the summary judgment hearing itself. (*Id*. at p. 175.) The trial court denied the request, which was affirmed on appeal where plaintiffs were aware earlier of facts supporting their belated amended claim and did not explain their lack of diligence in seeking leave to amend. Under these circumstances, the trial court did not abuse its discretion because it was unfair to allow plaintiffs "a 'moving target' unbounded by the pleadings." (*Id*. at p. 176.) In *Dang v. Smith* (2010) 190 Cal.App.4th 646, the appellate court rejected the plaintiff's effort on appeal to raise three new theories of liability where the plaintiff failed to provide a proposed amended pleading, showed no ability to prove those theories, and never asked the trial court for leave to amend her complaint. In *Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 648–654, the court stated a plaintiff wanting to rely on unpleaded theories must move to amend the complaint before the hearing on summary judgment and concluded the proposed unpleaded claims lacked merit anyhow. (Cf. *Prue v. Brady Co./San Diego, Inc.* (2015) 242 Cal.App.4th 1367, 1374, 1384–1385 [holding plaintiff pleaded a viable common law wrongful termination claim, and the trial court thus should not have granted summary judgment on that claim and also abused its discretion in denying amendment where the amendment request was made when plaintiff filed his opposition to summary judgment].)

29

see also *Leader v. Health Industries of America, Inc.* (2001) 89 Cal.App.4th 603, 613 ["a long deferred presentation of the proposed amendment without a showing of excuse for the delay is itself a significant factor to uphold the trial court's denial of the amendment"].)

For all these reasons, we conclude the trial court did not abuse its discretion in denying plaintiffs' motion to amend given their inadequate delay in waiting until after the trial court issued an order granting summary judgment in defendant's favor.[12]

## DISPOSITION

Judgment in favor of respondent Douglas Elliman of California, Inc. is affirmed.  Elliman is entitled to its costs on appeal.

NOT TO BE PUBLISHED.


BENDIX, J.


We concur:




ROTHSCHILD, P. J.                    M. KIM, J.

---

[12] We thus do not address plaintiffs' argument that the trial court also erred in concluding an amendment would be futile.